# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

      Plaintiff,

vs.                                    No. CR 11-2158 JB

DANIEL MANUEL RODRIGUEZ,

      Defendant.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on the Defendant's Motion and Memorandum to Suppress Evidence, filed October 3, 2011 (Doc. 24)("Motion"). The Court held an evidentiary hearing on November 16, 2011. The primary issues are: (i) whether the Albuquerque Police Department ("APD") officers lacked reasonable suspicion to conduct an investigatory stop to question Defendant Manuel Rodriguez; (ii) whether Terry v. Ohio, 392 U.S. 1 (1968), principles apply to investigation of a misdemeanor; (iii) whether the scope of the investigatory stop exceeded the bounds permitted by the Fourth Amendment; (iv) whether officers obtained Rodriguez' pre-arrest statements in violation of Miranda v. Arizona, 384 U.S. 436 (1966); (v) whether officers obtained an involuntary confession from Rodriguez in violation of the Due Process Clause; and (vi) whether any exceptions to the exclusionary rule should apply. The Court will deny the Motion. The Court concludes that the officers had reasonable suspicion to conduct an investigatory stop to question Rodriguez. Terry v. Ohio principles apply to investigations of ongoing misdemeanor offenses such as the offenses in this case. The officers did not exceed the permissible scope of an investigatory stop. The officers were not required to give Rodriguez warnings under Miranda v.

<u>Arizona</u> when they interviewed him outside the convenience store.  Because Rodriguez has not identified any confession he made to officers, the Court does not decide this issue.  Because the Court concludes that the officers engaged in no constitutional violations, the Court need not and does not decide whether any exceptions to the exclusionary rule should apply.

## **FACTUAL BACKGROUND**

Rule 12(d) of the Federal Rules of Criminal Procedure requires the Court to state its essential findings on the record when deciding a motion that involves factual issues.  <u>See</u> Fed. R. Crim. P. 12(d) ("When factual issues are involved in deciding a [pretrial] motion, the court must state its essential findings on the record.").  The findings of fact in this Memorandum Opinion and Order shall serve as the Court's essential findings for purposes of rule 12(d).  The Court makes these findings under the authority of rule 104(a) of the Federal Rules of Evidence, which requires a judge to decide preliminary questions relating to the admissibility of evidence, including the legality of a search or seizure, and the voluntariness of an individual's confession or consent to search.  <u>See</u> <u>United States v. Merritt</u>, 695 F.2d 1263, 1269-70 (10th Cir. 1982).  In deciding such preliminary questions, the other rules of evidence, except those with respect to privileges, do not bind the Court. <u>See</u> Fed. R. Evid. 104(a) ("The court must decide any preliminary question about whether a witness is qualified, a privilege exists, or evidence is admissible. In so deciding, the court is not bound by evidence rules, except those on privilege.").  Thus, the Court may consider hearsay in ruling on a motion to suppress.   <u>See</u> <u>United States v. Garcia</u>, 324 F.App'x 705 (10th Cir.)(unpublished)(recognizing that it was not necessary to "resolve whether <u>Crawford's</u>[1] protection of an accused's Sixth Amendment confrontation right applies to suppression hearings," but

---

[1] <u>Crawford v. Washington</u>, 541 U.S. 36 (2004).

indicating that Tenth Circuit precedent prior to <u>Crawford v. Washington</u> does not provide such

protection), <u>cert. denied</u>, 130 S. Ct. 223 (2009); <u>United States v. Merritt</u>, 695 F.2d at 1269; <u>United

States v. Christy</u>, No. 10-1534, 2011 WL 3933868, at *2 (D.N.M. Sept. 2, 2011)(Browning,

J.)("Thus, the Court may consider hearsay in ruling on a motion to suppress."); <u>United States v.

Hernandez</u>, 778 F.Supp.2d 1211, 1226 (D.N.M. 2011)(concluding "that <u>Crawford v. Washington</u>

does not apply to detention hearings").

    1.    On July 27, 2011, at approximately 5:52 p.m., APD officers received a 911 dispatch

call from a female caller.  <u>See</u> 911 Call Audio Recording (Government's Exhibit 1)("911

Recording"); Bernalillo County Sheriff's Department Computer Aided Dispatch at 1 (dated July 27,

2011)(Government's Exhibit 2)("CAD Report").[2]

    2.    She advised the 911 operator that, while at a convenience store, she observed two

employees of the store showing each other handguns -- one black and the other silver.  <u>See</u> 911

Recording at 0:08-1:10.

    3.    The caller identified one of the suspects as a heavy set man, wearing a yellow shirt,

and stated that he put the black gun down his belt.  <u>See</u> 911 Recording at 1:09-17.

    4.    She said that the other suspect, who was more slender, had the gun in his hands, but

that she was not sure what he did with the gun.  <u>See</u> 911 Recording at 1:17-21, 2:36-38.

    5.    She stated that both men were about five feet and seven inches tall.  <u>See</u> 911

Recording at 3:03-3:05.

    6.    The caller noted that there were three or four people in the store.  <u>See</u> 911 Recording

---

[2]For purposes of the suppression hearing, Rodriguez did not object to the admission of any of the United States' exhibits.  <u>See</u> Transcript of Hearing at 4:13-15 (taken November 16, 2011)(Barth, Middlebrooks).

at 1:21-23.

7.     The caller stated that she would prefer if officers investigated the situation.  See 911 Recording at 1:40-44.

8.     The caller stated that the convenience store was on the southwest corner of 61st and Central.  See 911 Recording at 1:52-59.

9.     The caller asserted that Arabic people ran the convenience store.  See 911 Recording at 2:04-06.

10.     The caller stated that the employees were not pointing guns at anyone.  See 911 Recording at 2:13-21.

11.     The caller identified herself as Nancy and provided her telephone number.  See 911 Recording at 3:21-35; Transcript of Hearing at 11:5-9 (taken November 16, 2011)(Barth, Munoz)("Tr.");[3] Tr. at 38:8-12 (Middlebrooks, Munoz).

12.     The location that Nancy described in her 911 call is an area with a high crime rate. See Tr. at 7:21-22 (Munoz).

13.     Police receive a high number of calls for assistance in this area for violent crimes and property crimes.  See Tr. at 7:23-8:4 (Barth, Munoz).

14.     Officer Frank Munoz is a detective with the APD who has worked there for ten years. See Tr. at 5:23-6:2 (Barth, Munoz).

15.     Before working with the APD, Munoz worked for the Los Lunas Police Department for six years.  See Tr. at 6:6-11 (Barth, Munoz).

16.     Munoz was on duty as a patrol officer in the field on July 27, 2011.  See Tr. at 7:5-8

---

[3]The Court's citations to the transcript of the hearing refers to the court reporter's original, unedited version.  Any final transcript may contain slightly different page and/or line numbers.

(Barth, Munoz).

17.     Munoz was in a full police uniform on July 27, 2011.  <u>See</u> Tr. at 8:10-15 (Barth, Munoz).

18.     While on duty, Munoz received an order around 5:57 p.m. from the APD dispatch to respond to a situation at 6102 Central Avenue SW.  <u>See</u> CAD Report at 1; Tr. at 8:16-19, 12:14-15 (Barth, Munoz).

19.     APD dispatch labeled the incident as a Type-31 call -- a suspicious person/vehicle. <u>See</u> Tr. 10:23-11:4.

20.     Munoz did not know the identity of the person who made the 911 call.  <u>See</u> Tr. at 38:5-12 (Middlebrooks, Munoz).

21.     Munoz did not know the 911 caller's motivation for making the 911 call or whether she had any prior relationship or experiences with the individuals in the store.  <u>See</u> Tr. at 38:15-39:12 (Middlebrooks, Munoz).

22.     Munoz did not contact Nancy before he arrived at the convenience store.  <u>See</u> Tr. at 38:8-12 (Middlebrooks, Munoz).

23.     APD dispatch informed Munoz that the person who made the 911 call saw two employees showing each other handguns, one of which was black and one of which was silver.  <u>See</u> CAD Report at 1.

24.     APD dispatch informed Munoz that one of the suspects was five feet and seven inches tall, was Arabic, and had a slender build.  <u>See</u> CAD Report at 1.

25.     APD dispatch informed Munoz that the other suspect was five feet and seven inches tall, was Arabic, had a heavy build, and was wearing a yellow shirt.  <u>See</u> CAD Report at 1.

26.     APD dispatch also informed Munoz that the heavy set suspect concealed the black

-5-

handgun in his waistband and that it was unknown where the slender suspect had concealed his weapon.  See CAD Report at 1.

27.     The conduct reported on this dispatch was not necessarily criminal activity.  See Tr. at 41:8-11 (Middlebrooks, Munoz).

28.     Officer Steve Miller also received an order to visit 6102 Central Avenue SW.  See Tr. at 11:12-13 (Munoz).

29.     A gas station is located at the address, 6102 Central Avenue SW.  See Tr. at 8:20-21 (Barth, Munoz).

30.     Munoz had gone to this location  around fifty to sixty times before in the three years preceding July 27, 2011 to respond to calls for police assistance.  See Tr. at 8:23-9:2 (Barth, Munoz).

31.     The calls to which Munoz responded at this location in the past involved conduct such as drug activity, use or possession of firearms, and traffic violations.  See Tr. at 9:3-5 (Barth, Munoz).

32.     Munoz and Miller both pulled into the gas station parking lot at the same time.  See Tr. at 13:14-20 (Barth, Munoz).

33.     Miller was also in his APD uniform.  See Tr. at 13:21-23 (Barth, Munoz).

34.     The officers observed Rodriguez in the convenience store.  See Tr. at 14:2-12 (Barth, Munoz).

35.     The officers did not draw their weapons when they entered the store.  See Tr. at 14:16-19 (Barth, Munoz).

36.     The officers observed Rodriguez near one of the shelves in the store and concluded that he was stocking the shelves with items.  See Tr. at 14:22-24 (Munoz).

37.     Based on that observation, it would have been reasonable for the officers to conclude that Rodriguez was an employee of the store.  See Tr. at 48:16-18 (Middlebrooks, Munoz).

38.     As Rodriguez was bending over stocking the shelves, Munoz observed a silver handgun tucked in the waistband of the back of Rodriguez' pants.  See Tr. at 14:22-15:9 (Barth, Munoz).

39.     The handgun was concealed by Rodriguez' shirt before he bent over.  See Tr. at 15:1-9 (Munoz).

40.     This handgun officers observed tucked into Rodriguez' waistband was a .357 magnum revolver.  See Tr. at 23:7-11 (Barth, Munoz).

41.     Following those observations, the officers asked Rodriguez to step outside of the store with them and told Rodriguez to show the officers his hands.  See Tr. at 15:14-15 (Barth, Munoz); Tr. at 49:22-25 (Munoz).[4]

42.     The area in the store where Rodriguez and the officers were located did not have a lot of space.  See Tr. at 15:16-20 (Munoz).

43.     When the officers asked Rodriguez to step outside the store, he was upset and asked the officers what he had done.  See Tr. at 15:19-20 (Munoz).

_____

[4]Rodriguez contends that the officers told him to put his hands in the air while they were in the store.  Munoz denied that he ever instructed Rodriguez to do so and stated that he does not normally ask people to put their hands in the air.  See Tr. at 49:20-25 (Middlebrooks).  Munoz also stated that he instructed Rodriguez to show the officer his hands as they walked out of the store.  See Tr. at 49:24-25 (Munoz).  Munoz offered a plausible explanation for why he instructed Rodriguez to exit the store before obtaining the gun from him -- specifically that the store had very little space -- and in doing so was able to procure the gun from Rodriguez once Rodriguez passed in front of him.  See Tr. at 15:15-20 (Munoz).  Based on that explanation, and that Munoz was direct in answering questions regarding what occurred when he first encountered Rodriguez, the Court concludes that Munoz is credible in his assertion that he did not ask Rodriguez to place his hands above his head before leaving the store.  Additionally, Rodriguez did not offer his own testimony or testimony from anyone who was at the store to rebut Munoz' testimony.

44.     Munoz then told him to step outside.  <u>See</u> Tr. at 15:21-22 (Munoz).

45.     As Rodriguez walked out the door, Munoz took the gun from the back of Rodriguez' waistband for officer safety.  <u>See</u> Tr. at 15:23-16:3 (Munoz, Barth).

46.     Other than procuring the firearm from Rodriguez, the officers did not push or otherwise come into physical contact with Rodriguez while exiting the store.  <u>See</u> Tr. at 51:3-20 (Middlebrooks, Munoz).[5]

47.     Munoz was wearing a recording device during the encounter with Rodriguez.  <u>See</u> Tr. at 16:4-5 (Barth, Munoz).

48.     Munoz asked Rodriguez why he was concealing a handgun, to which Rodriguez responded: "I'm working, bro."  Transcript of Officer Frank Munoz' Belt Tape at 2:9-11 (dated July 27, 2010)(Government's Exhibit 3a)("Munoz Belt Tape").

49.     Munoz asked if Rodriguez had a permit to carry the firearm, to which Rodriguez responded he did not.  <u>See</u> Munoz Belt Tape at 2:12-14.

50.     After asking Rodriguez a few questions, Munoz told Rodriguez to turn around and put his hands on a truck in the parking lot.  <u>See</u> Munoz Belt Tape at 2:18-19.

51.     The officers also instructed Akmal Awwad, the other suspect described in the 911

---

[5]Munoz testified that the only contact he had with Rodriguez before leaving the store was that he pulled the gun out of Rodriguez' waistband.  <u>See</u> Tr. at 51:3-7 (Middlebrooks, Munoz).  He testified that it would not have been possible for Miller to have pushed or shoved Rodriguez when exiting the store, as Miller was behind Munoz.  <u>See</u> Tr. at 51:11-17 (Middlebrooks, Munoz).  While he testified that, because things were happening quickly, it might have been possible that Rodriguez was touched or pushed to some extent, <u>see</u> Tr. at 51:18-24 (Middlebrooks, Munoz), there was no additional evidence suggesting such contact occurred -- such as testimony to that effect from Rodriguez.  Given that Munoz' answers regarding his contact with Rodriguez were relatively specific, and given that Miller does not appear -- based on his location in relation to Munoz -- to have been able to touch Rodriguez, the Court concludes that the officers did not come into physical contact with Rodriguez, other than procuring the handgun from him, before leaving the store.

call, to put his hands on his head and to lock his frame.  <u>See</u> Munoz Belt Tape at 2:24-3:1; Tr. at 17:19-23.

52.     Awwad came outside after officers began questioning Rodriguez and remained there throughout the duration of the questioning.  <u>See</u> Munoz Belt Tape at 2:23-14:4; Tr. at 18:7-9 (Barth, Munoz); Tr. at 33:17-34:6 (Middlebrooks, Munoz).

53.     At this time, Munoz began speaking with Rodriguez in a more aggressive tone, although many of the questions Munoz asked following that point were not asked in an aggressive manner.  <u>See</u> Recording of Officer Frank Munoz' Belt Tape at 4:00-9:30 (dated July 27, 2010)(Government's Exhibit 3)("Recording of Munoz Belt Tape"); Munoz Belt Tape at 3:7-11.

54.     Munoz then told Rodriguez and Awwad that it is illegal to conceal a firearm, and said that someone had come into the store earlier and seen them with the weapons.  <u>See</u> Munoz Belt Tape at 3:7-11.

55.     Awwad said that Rodriguez "doesn't understand what's going on" after the officer instructed them it was illegal to have a concealed firearm.  Munoz Belt Tape at 3:20-21.

56.     Munoz responded: "Well, he had no idea what's going on.  He's got a loaded handgun on him."  Munoz Belt Tape at 4:2-3.

57.     Munoz asked who owned the convenience store.  <u>See</u> Munoz Belt Tape at 4:9-10.

58.     Awwad told Munoz that the owners of the store were not at the store.  <u>See</u> Munoz Belt Tape at 4:13-14.

59.     Rodriguez stated that he was carrying a firearm because the other day he was almost shot.  <u>See</u> Munoz Belt Tape at 4:23-25.

60.     Munoz explained to Rodriguez that the law permitted him to carry a firearm in plain view, but not to conceal the weapon.  <u>See</u> Munoz Belt Tape at 5:17-23.

61.     When Awwad told Munoz that his weapon was in the store, Munoz stated that he was not concerned with the gun being in that location.  See Munoz Belt Tape at 6:8-15.

62.     Rodriguez informed the officer that he did not own the convenience store.  See Munoz Belt Tape at 7:24-25.

63.     Munoz then told Miller to run a "check" on Rodriguez.  Munoz Belt Tape at 8:1-2.

64.     When Munoz asked Rodriguez if he had ever been to prison, Rodriguez responded that he had just gotten out of prison.  See Munoz Belt Tape at 8:7-10.

65.     Munoz then responded: "Okay.  Then you're a convicted felon, and you shouldn't even have a firearm.  Do you understand that?"  Munoz Belt Tape at 8:11-13.

66.     Rodriguez responded that he did not understand.  See Munoz Belt Tape at 8:11-14.

67.     Munoz had observed tattoos on Rodriguez' legs while questioning Rodriguez, which he recognized as tattoos that would have been done inside a prison facility.  See Munoz Belt Tape at 9:7-14; Tr. at 20:23-21:10 (Barth, Munoz); Tr. at 53:24-54:9, 55:7-13 (Middlebrooks, Munoz).

68.     Munoz then stated to Rodriguez: "Let's go over there to the curb and have a seat." Munoz Belt Tape at 9:16-17.

69.     Munoz allowed Rodriguez to smoke a cigarette at this point.  See Munoz Belt Tape at 9:24-25.

70.     When Munoz asked Rodriguez from where he received the gun, Rodriguez stated that he got it from the counter in the store.  See Munoz Belt Tape at 10:10-13.

71.     After other officers had run a check on the firearm Munoz obtained from Rodriguez, they informed Munoz that it was a stolen firearm.  See Tr. at 22:10-23:6 (Barth, Munoz).

72.     The portion of Munoz' belt tape in which he asked Rodriguez questions indicates that he no longer spoke to Rodriguez after the officers had been outside the store for approximately six

and a half minutes.  <u>See</u> Recording of Munoz Belt Tape at 4:00-10:40.

73.     The entire recording of the belt tape lasts approximately eight and a half minutes.  <u>See</u> Recording of Munoz Belt Tape at 4:00-12:30.

74.     Many of Rodriguez' answers while outside the convenience store indicate he was not taking the officers' questions particularly seriously.  <u>See</u> Recording of Munoz Belt Tape at 4:00-10:40.

75.     Rodriguez did not appear to be more fearful during the questioning than an average citizen would have been under the circumstances.   <u>See</u> Recording of Munoz Belt Tape at 4:00-10:40.

76.     Rodriguez did not appear to be more susceptible to coercion, more emotionally unstable, or more fearful during the questioning than the average citizen would have been under the circumstances.   <u>See</u> Recording of Munoz Belt Tape at 4:00-10:40.

77.     Other than indicating that some of his conduct may result in his arrest, the officers did not make any threats to Rodriguez during the interrogation.  <u>See</u> Munoz Belt Tape at 2:1-14:4.

78.     The officers did not make any promises to Rodriguez while interrogating him outside the convenience store.  <u>See</u> Munoz Belt Tape at 2:1-14:4.

79.     Beyond asking some questions in an aggressive manner, the officers did not use any psychological force against Rodriguez while questioning him.  <u>See</u> Recording of Munoz Belt Tape at 4:00-10:40.

80.     Awwad informed the officers that he did not know to whom the gun that was in Rodriguez' possession belonged.  <u>See</u> Munoz Belt Tape at 13:3-5; Tr. at 29:16-18 (Barth, Munoz).

81.     At this time, Munoz placed handcuffs on Rodriguez to arrest him for possession of stolen property.  <u>See</u> Tr. at 25:19-26:2 (Barth, Munoz); Tr. at 30:5-8 (Barth, Munoz).

82.     There was no evidence at the suppression hearing regarding when Rodriguez received warnings under Miranda v. Arizona.

83.     Before the officers placed handcuffs on Rodriguez, they ran a check on him on the computer in their vehicle and found that he had no outstanding local warrants. See Tr. at 26:14-16 (Munoz, Barth).

84.     Munoz believed that, if Rodriguez had permission to carry the firearm on the premises from someone in the store, Rodriguez would not need a permit to carry the weapon. See Tr. at 24:24-25:2 (Barth, Munoz).

85.     Rodriguez never informed Munoz that he had authorization from anyone in the store or any store representative to carry the firearm, or that anyone had given him the weapon to carry. See Tr. at 25:3-13 (Barth, Munoz).

86.     Neither Awwad nor Rodriguez showed the officers anything in writing indicating that they had authorization to carry a weapon in the store. See Tr. at 33:6-10 (Barth, Munoz).

87.     The officers never asked Rodriguez if he had permission from the owner of the store to carry a firearm. See Tr. at 34:22-25 (Middlebrooks, Munoz).

88.     The officers never asked Awwad if he had given permission to Rodriguez to carry a firearm, or whether Awwad's uncle had ever given Awwad or Rodriguez permission to carry a firearm. See Tr. at 34:3-9 (Middlebrooks, Munoz).

89.     Following Rodriguez' arrest, the officers contacted APD dispatch, which sent them a form to fill out containing Rodriguez' information. See Tr. at 26:17-23 (Barth, Munoz).

90.     This information allows officers to determine if a suspect has any prior convictions. See Tr. at 26:20-23 (Munoz).

91.     After the officers transported Rodriguez to the police station, they received

confirmation that he was a convicted felon.  <u>See</u> Tr. at 26:24-27:9 (Barth, Munoz).

92.     In the convenience store, the officers located two additional firearms, neither of which was stolen.  <u>See</u> Tr. at 32:3-6 (Barth, Munoz); Tr. at 35:10-13 (Middlebrooks, Munoz).

93.     The officers did not arrive at the convenience store for a welfare check on a person or as part of their community caretaker function.  <u>See</u> 40:1-3 (Middlebrooks, Munoz).

94.     Before going into the store, the officers did not contact the owners of the convenience store and determine their attitude towards whether Rodriguez and Awwad could carry handguns. <u>See</u> Tr. at 41:19-22 (Middlebrooks, Munoz).

95.     There were no signs posted at the convenience store indicating that the owner had any objections to firearms inside the store.  <u>See</u> Tr. at 41:23-42:4 (Middlebrooks, Munoz).

96.     There was no indication that Rodriguez or Awwad were intoxicated.  <u>See</u> Tr. at 42:15-17 (Middlebrooks, Munoz).

97.     Before questioning Rodriguez and Awwad in the store, the officers had no knowledge about these individuals or their criminal record.  <u>See</u> Tr. at 42:18-22 (Middlebrooks, Munoz).

98.     There was no indication from the dispatch that a burglary was occurring in the store. <u>See</u> Tr. at 43:15-17 (Middlebrooks, Munoz).

99.     Other than the dispatch Munoz received about the situation at the convenience store, he had received no other dispatches or reports about the store on July 27, 2010.  <u>See</u> Tr. at 47:7-10 (Middlebrooks, Munoz).

100.     When the officers arrived at the store, they did not see any criminal activity occurring in the store from outside the store.  <u>See</u> Tr. at 46:25-47:2 (Middlebrooks, Munoz).

101.     The officers did not get into a physical altercation with Rodriguez or feel threatened by Rodriguez' conduct.  <u>See</u> Tr. at 58:13-16 (Barth, Munoz).

102.    The officers had been at the convenience store approximately fifteen minutes before handcuffing Rodriguez and had left the convenience store within thirty minutes of their arrival.  See Tr. at 58:17-21 (Barth, Munoz); CAD Report at 1-2.

## PROCEDURAL BACKGROUND

Rodriguez is charged with one count of felon in possession of a firearm and ammunition, contrary to 18 U.S.C. §§ 922(g)(1) and 924(a)(2), for allegedly having in his possession, custody, and control, a Smith and Wesson model 66-4, .357 magnum revolver and five rounds of Winchester brand .357 ammunition.  See Indictment at 1-2, filed August 9, 2011 (Doc. 10).

On October 3, 2011, Rodriguez filed his Motion seeking suppression of all the evidence that law enforcement officers seized, including the Smith and Wesson .357 magnum revolver and five rounds of Winchester .357 ammunition, as well as all statements that Rodriguez made to law enforcement.  See Motion at 1.  He contends that the officers did not have reasonable suspicion to conduct an investigatory stop.  See Motion at 4-5.  He contends that the anonymous tip they received from the 911 call was not sufficient to give them reasonable suspicion.  See Motion at 5-9.  Rodriguez contends that the anonymous tip did not convey sufficient information for the officers to conclude that a crime had occurred.  See Motion at 5-6.  Additionally, he contends that the anonymous call lacked sufficient indica of reliability.  See Motion at 6-8.  He asserts that officers observing a weapon does not by itself give rise to reasonable suspicion.  See Motion at 9.  He also argues that there are various exceptions under New Mexico law permitting a person to carry a concealed handgun without a permit, including if they are "on real property belonging to him as owner, lessee, tenant or licensee." Motion at 10 (emphasis omitted)(quoting N.M.S.A. 1978, § 30-7-2(A)(1)).  Rodriguez contends that he was working at the store with the owner's express permission, and that there is no evidence that the employer or owner objected to him carrying a firearm while

he was in the store.  See Motion at 10.  Rodriguez asserts that whether the officers were mistaken about the existence or application of this law does not aid them in acquiring reasonable suspicion. See Motion at 11.  He also notes that, given the misdemeanor nature of the offense of unlawfully carrying a concealed handgun under New Mexico law, the officers could not justify an investigatory stop under the circumstances.  See Motion at 11-13.  He asserts that the officers were not acting under their community caretaker function and were not acting to protect their own safety.  See Motion at 13-15.  He argues that no exception to the exclusionary rule applies.  See Motion at 15-17. Rodriguez contends that the Court should exclude the statements he made to officers outside the convenience store because the officers failed to give him his warnings under Miranda v. Arizona. See Motion at 17-19.  He also asserts that the officers' conduct violated the Fourteenth Amendment, because his "will was overborne by the circumstances surrounding the giving of a confession." Motion at 19-20.  Lastly, he requests leave to assert a suppression argument at a later time based on selective enforcement if discovery provides him with evidence that the officers responded to the call because they heard some of the suspects were Arabs.  See Motion at 20.

On October 18, 2011, the United States filed the Response of the United States to Defendant's Motion and Memorandum to Suppress Filed October 3, 2011.  See Doc. 26 ("Response").  The United States argues that the officers had reasonable suspicion to conduct an investigatory stop of Rodriguez.  See Response at 3-7.  The United States emphasizes that the officers had their own observations at the convenience store in addition to the 911 call to support their reasonable suspicion.  See Response at 4-5.  The United States contends that, when they faced the situation in the convenience store, they had three possible scenarios before them that required further investigation: (i) Rodriguez may have been carrying the handgun without, as New Mexico law requires, a permit; (ii) Rodriguez was lawfully carrying the handgun if he had express or implied

consent from the store's owner; or (iii) he might have been a felon in possession of a firearm.  See Response at 4-5.  It asserts that, under New Mexico law, "[a] licensee carrying a concealed handgun on or about his person in public, shall, upon demand by a peace officer, display his license to carry a concealed handgun."  Response at 5 n.1 (citing N.M. Code R. § 10.8.2.16).  The United States argues that courts must evaluate the officer's conduct "in light of common sense and ordinary human experience," and defer to "the ability of a trained law enforcement officer to distinguish between innocent and suspicious actions."  Response at 6 (quoting United States v. Stephenson, 452 F.3d 1173, 1776 (10th Cir. 2006)).  The United States contends that officers do not need to rule out the possibility of innocent conduct to form reasonable suspicion.  See Response at 6.  The United States asserts that the officers were entitled to procure Rodriguez' gun from him to protect their safety.  See Response at 6.  It argues that the principles in Terry v. Ohio regarding investigatory stops apply to misdemeanors.  See Response at 8-10.  The United States argues that Rodriguez was not in custody for Miranda v. Arizona purposes while the officers questioned him in front of the convenience store.  See Response at 10-13.  The United States contends that the inevitable-discovery exception to the exclusionary rule applies in this case, because the police could have lawfully determined Rodriguez was a convicted felon in spite of any constitutional violations they committed. See Response at 13-15.  The United States concedes that the officers' community caretaker function would not apply to the facts of this case.  See Response at 15.

On November 10, 2011, Rodriguez filed his Defendant's Supplement to Motion and Memorandum to Suppress Evidence.  See Doc. 33 ("Supplement").  He notes that N.M.S.A. 1978, § 30-7-2(A)(1) would have permitted him to carry a firearm at the convenience store as an owner, lessee, tenant, or licensee on the premises.  See Supplement at 1.  He concedes, however, that, because he was a convicted felon, the statute would not have permitted his conduct.  See Supplement

at 1-2 n.1.  He notes, however, that this statute is relevant regarding the officer's initial investigatory detention at the convenience store.  See Supplement at 1-2 n.1.  He asserts that Awwad, one of the convenience store's owners, was the individual present at the store along with Rodriguez who implicitly condoned Rodriguez carrying a firearm.  See Supplement at 2 n.2.  Rodriguez contends that there were no signs at the convenience store indicating that he could not carry a firearm on the premises.  See Supplement at 2.

At the evidentiary hearing on November 16, 2011, the parties presented evidence regarding the legality of the officers' actions.  The Court questioned whether it was necessary for the officers to rely on the contents of the 911 call, because they had likely developed reasonable suspicion while they were at the convenience store.  See Tr. at 62:8-15 (Court).  Rodriguez responded that no one had reported a crime in the 911 call.  See Tr. at 62:16-25 (Middlebrooks).  The Court questioned why the police should be punished for responding to a call of suspicious activity.  See Tr. at 64:2-4 (Court).  The Court inquired why observing a gun did not give the officers' reasonable suspicion to conduct an investigatory stop.  See Tr. at 65:21-66:2 (Court).  Rodriguez argued that police cannot go up to people arbitrarily in the street and start asking them questions unless the police have an articulated belief that the person has been involved in a crime.  See Tr. at 67:7-11 (Middlebrooks).  Rodriguez contended that there is an exception under New Mexico laws for those who carry concealed handguns with the permission of the property's owner.  See Tr. at 67:15-68:1 (Middlebrooks).  Rodriguez later clarified, however, that police may engage in consensual encounters with citizens without reasonable suspicion.  See Tr. at 69:1-6 (Middlebrooks).  He contended that the encounter in the convenience store was at no point a consensual encounter.  See Tr. at 69:7-14 (Middlebrooks).  The Court noted that ambiguous conduct by a person that may be criminal or may not be criminal can justify an investigatory stop.  See Tr. at 71:21-22 (Court).

The United States conceded that the 911 call alone did not give the officers' reasonable suspicion. See Tr. at 75:5-8 (Court, Barth). The United States argued that, anytime officers see a concealed weapon in New Mexico, they have reasonable suspicion to conduct an investigatory stop. See Tr. at 76:24-77:5 (Court, Barth). The United States noted that federal law overrides state law to the extent that state law permits a convicted felon to carry a firearm when federal law would not permit that conduct. See Tr. at 78:7-11 (Barth). The United States also contended that the officers had authority to remove the gun from Rodriguez' possession to protect their safety. See Tr. at 83:1-9 (Court, Barth). The Court questioned whether under all circumstances viewing a concealed weapon would permit officers to take that weapon away from an individual. See Tr. at 83:1-6 (Court). The United States contended that Rodriguez providing the officers with information that he had just gotten out of prison and their observations of his tattoos supported their conduct. See Tr. at 84:12-24 (Barth). Rodriguez contended that he was in custody for Fifth Amendment purposes when the officers told him to put his hands up in the air inside the convenience store. See Tr. at 88:2-4 (Middlebrooks). He contends that the Court should exclude the statements he made about his time in prison and that he does not have a permit to carry a concealed weapon. See Tr. at 88:18-21 (Middlebrooks). The United States contended that an arrest occurred shortly after the officers learned Rodriguez was in possession of a stolen firearm. See Tr. at 89:16-19 (Barth). The United States noted that officers may restrict a person's movement without transforming an investigatory stop into an arrest. See Tr. at 89:19-23 (Barth). The Court noted that Rodriguez may have been seized under the Fourth Amendment before an arrest for Fifth Amendment purposes occurred. See Tr. at 90:24-91:4 (Court). Rodriguez argued that the inevitable-discovery rule does not apply when the discovery results from some prior police error or misconduct. See Tr. at 92:4-8 (Middlebrooks). The United States contended that, if the officers had not concluded that Rodriguez was a convicted

felon, they would have discovered that the handgun was stolen and been able to arrest him for that conduct.  See Tr. at 94:14-25 (Barth).

### RELEVANT LAW REGARDING FOURTH-AMENDMENT SEIZURES

For purposes of analyzing Fourth Amendment seizures, the Tenth Circuit has divided interactions between police and citizens into three categories: (i) consensual encounters; (ii) investigative stops; and (iii) arrests.  See Oliver v. Woods, 209 F.3d 1179, 1186 (10th Cir. 2000). A consensual encounter occurs when a police officer approaches a person to ask questions under circumstances where a reasonable person would feel free to refuse to answer and to end the encounter.  See Oliver v. Woods, 209 F.3d at 1186.  For example, officers generally may "go to a person's home to interview him," United States v. Daoust, 916 F.2d 757, 758 (1st Cir. 1990), because "[i]t is not improper for a police officer to call at a particular house and seek admission for the purpose of investigating a complaint or conducting other official business,"  1 W. LaFave, Search and Seizure: A Treatise on the Fourth Amendment § 2.3(b), at 475 (3d ed. 1996).  Such encounters generally "are not seizures within the meaning of the Fourth Amendment, and need not be supported by suspicion of criminal wrongdoing."  Oliver v. Woods, 209 F.3d at 1186.

### 1.    Investigative Detentions and Reasonable Suspicion.

An encounter that is not consensual may nevertheless be justified as an investigative detention.  An investigative detention occurs when an officer stops and briefly detains a person "in order to determine his identity or to maintain the status quo momentarily while obtaining more information."  Oliver v. Woods, 209 F.3d at 1186 (quoting Adams v. Williams, 407 U.S. 143, 146 (1972)).  Inasmuch as such brief investigative detentions are not consensual, they constitute a seizure and must meet two distinct requirements to be "reasonable" under the Fourth Amendment.  First, the officer "must have a particularized and objective basis for suspecting the particular person

stopped of criminal activity."  Oliver v. Woods, 209 F.3d at 1186 (quoting United States v. Cortez,

449 U.S. 411, 417-18 (1981)).  Second, the investigative detention that follows the stop must be

"reasonably related in scope to the circumstances" which justified the stop in the first place, Terry

v. Ohio, 392 U.S. at 20, because the Fourth Amendment imposes "limitations on both the length of

the detention and the manner in which it is carried out," United States v. Holt, 264 F.3d 1215, 1229

(10th Cir. 2001)(en banc).

        "For reasonable suspicion to exist, an officer 'need not rule out the possibility of innocent

conduct;' he or she simply must possess 'some minimal level of objective justification' for making

the stop."  United States v. Winder, 557 F.3d 1129, 1134 (10th Cir. 2009)(quoting United States v.

Vercher, 358 F.3d 1257, 1261 (10th Cir. 2004)).  This standard is met by information "falling

'considerably short' of a preponderance standard."  United States v. Winder, 557 F.3d at 1134.  A

police/citizen encounter that goes beyond the limits of a stop under Terry v. Ohio is an arrest which

must be supported by probable cause or consent to be valid.  See United States v. Perdue, 8 F.3d

1455, 1462 (10th Cir. 1993)("An encounter between police and an individual which goes beyond

the limits of a Terry stop, however, may be constitutionally justified only by probable cause or

consent.").

        An officer may "stop and frisk" an individual under the Fourth Amendment if a reasonably

prudent person "in the circumstances would be warranted in the belief that his safety or that of

others was in danger."  Terry v. Ohio, 392 U.S. at 27.  "The officer need not be absolutely certain

that the individual is armed; the issue is whether a reasonably prudent man in the circumstances

would be warranted in the belief that his safety or that of others was in danger."  Terry v. Ohio, 392

U.S. at 27.  A frisk "must . . . be confined in scope to an intrusion reasonably designed to discover

guns, knives, clubs, or other hidden instruments for the assault of the police officer."  Terry v. Ohio,

392 U.S. at 29.  In evaluating the validity of the stop-and-frisk, the totality of the circumstances must be considered.  See Florida v. Bostick, 501 U.S. 429, 436 (1991).

These stop-and-frisk principles apply with equal weight to motorists and to pedestrians. Michigan v. Long, 463 U.S. 1032, 1050-51 (1983).  The Tenth Circuit has adopted the doctrine in Terry v. Ohio for an investigative detention -- "stop" --  and for a protective search --  "frisk."

> Terry has come to stand for two distinct propositions -- an investigative detention ('stop') in which a police officer, for the purpose of investigation, may briefly detain a person on less than probable cause, . . . and a protective search ('frisk') which permits an officer, in the course of an investigative detention, to conduct a limited search for weapons for his or her own protection.

United States v. King, 990 F.2d 1552, 1557 (10th Cir. 1997)(citations omitted)).  The legal standard is whether a "stop and frisk" is reasonable under the Fourth Amendment.  United States v. King, 990 F.2d at 1557.

In United States v. Johnson, 364 F.3d 1185 (10th Cir. 2004), the Tenth Circuit held that an officer had reasonable suspicion to continue questioning and to frisk a suspect after: (i) the officer had responded  to a call from a citizen who gave his telephone number, and gave a detailed and accurate description of possible criminal activity and of the suspect; (ii) the contact occurred in Albuquerque's highest-crime area; and (iii) the suspect displayed nervous behavior.  See id. at 1194. The Tenth Circuit noted that the officer's experience and training allowed him to make inferences, based on a combination of the surrounding circumstances, that criminal activity was afoot.  See id. ("His suspicions were particularized to [the suspect], and were based on how his training and experience taught him to interpret a number of objectively reasonable details.").  While many of the factors that the Tenth Circuit considered did not, without more, give rise to reasonable suspicion, the combination of circumstances was sufficient.  See id. at 1193 (noting that the district court had erred, because "[a]ll of these factors, mitigating and aggravating, should have been analyzed as part

-21-

of the totality of the circumstances faced by [the officer] at the inception of the detention").

In United States v. Ceballos, 355 F.App'x 226 (10th Cir. 2009)(unpublished), the police officer observed a young girl walking down the street at night. See 355 F.App'x at 227-28. A truck pulled up alongside the girl, the driver of the truck and the girl spoke briefly, then the truck drove ahead and the girl continued on her walk. See id. Rather than leave, however, the truck drove ahead and parked with its lights off at a dark spot on the road by which the girl would have to walk. See id. The officer spoke to the girl, who seemed unconcerned and told him that the man in the truck had asked only if she needed a ride; she had refused. See id. Not investigating any particular crime or suspected-crime, and admittedly acting on a "hunch," the officer turned on his emergency lights and pulled up behind the truck. Id. Upon talking to Ceballos, the officer discovered that Ceballos' breath smelled of alcohol, he did not have a driver's license, and he had a gun and other items in his vehicle. See id. at 227-29. The Tenth Circuit found that the facts available to the officer would have led a reasonable officer to conclude that reasonable suspicion existed, and that the officer's "subjective characterization of his actions is irrelevant." Id. The Tenth Circuit explained:

> A review of the totality of the circumstances shows Gallegos was not acting on an unparticularized hunch; during his testimony he articulated specific facts that caused him to suspect Ceballos intended to assault or abduct the teenage pedestrian. Specifically, at the time Gallegos initiated the traffic stop, he had observed Ceballos slow his vehicle as he passed a teenage girl walking alone late at night. He then observed Ceballos alter his route by making a U-turn and following the girl down a narrow, nearly deserted residential street. Ceballos pulled alongside the girl, who he did not know, and asked her if she wanted a ride. She refused, telling him she lived up the street. Ceballos then drove further down the road, pulled into a driveway as if to turn around and return to the main road, but instead backed out and drove a few feet further east, in the same direction the girl was walking. He parked in a dark location and turned off his lights.
>
> . . . .
>
> We agree with the Government that Officer Gallegos had reasonable suspicion to stop and detain Ceballos. Ceballos showed an interest in a teenage girl he did not

know, to the point that he changed his route to follow her down a dark street, offered her a ride, and then parked where the girl would be required to walk past him as she continued to her home.  The facts found by the district court, viewed in totality, amply support the constitutionality of the investigative detention.

Id. at 228-30.  The Tenth Circuit did not require the officer to identify the particular crime of which he or she had reasonable suspicion, or even to acknowledge that he or she had reasonable suspicion.  The Tenth Circuit was content to find that a reasonable officer would have reasonable suspicion that "Ceballos intended to assault or abduct the teenage pedestrian."  Id. at 229.  The Tenth Circuit demanded only that an officer have facts from which a reasonable officer could form a reasonable suspicion that criminal conduct was occurring or was about to occur.  See id.

### 2.    **Arrests.**

A seizure that exceeds the investigative detention's limited scope or duration may nevertheless be justified as an arrest.  An arrest is a seizure that is "characterized by highly intrusive or lengthy search or detention."  Oliver v. Woods, 209 F.3d at 1186 (quoting United States v. Cooper, 733 F.2d 1360, 1363 (10th Cir. 1984)).  The general rule is that "the use of firearms, handcuffs, and other forceful techniques" is sufficiently intrusive to signal that a person has been placed under arrest.  United States v. Melendez-Garcia, 28 F.3d 1046, 1052-53 (10th Cir. 1994).  See Florida v. Royer, 460 U.S. 491, 499 (1983).  Inasmuch as an arrest exceeds an investigative stop's limited scope or duration, it must be supported by probable cause.

### RELEVANT FIFTH AMENDMENT LAW

The self-incrimination clause of the Fifth Amendment states: "No person shall be . . . compelled in any criminal case to be a witness against himself."  U.S. Const. amend. V.  Statements made by a defendant during a custodial interrogation by a law-enforcement officer are generally not admissible as evidence against that defendant if the declarant has not received the warnings that

*Miranda v. Arizona* requires.  See *Dickerson v. United States*, 530 U.S. 428, 444 (2000); *United States v. Chee*, 514 F.3d 1106, 1112 (10th Cir. 2008).  The requirements of *Miranda v. Arizona*, however, are limited.  "Police officers need not administer *Miranda* warnings to everyone they question." *United States v. Jones*, 523 F.3d 1235, 1239 (10th Cir. 2008).  Rather, "*Miranda* applies only to 'custodial interrogation[s].'" *United States v. Jones*, 523 F.3d at 1239 (quoting *Miranda v. Arizona*, 384 U.S. at 444).

In other words, "*Miranda* rights need only be given to a suspect at the moment that suspect is 'in custody' and the questioning meets the legal definition of 'interrogation.'" *United States v. Chee*, 514 F.3d at 112 (quoting *United States v. Perdue*, 8 F.3d 1455, 1463 (10th Cir. 1993)).  Any questioning by law-enforcement officers "reasonably likely to elicit an incriminating response" constitutes an interrogation.  *Rhode Island v. Innis*, 446 U.S. 291, 301 (1980).  See *United States v. Medrano*, 356 F.App'x 102, 107 (10th Cir. 2009)(unpublished); *United States v. Parra*, 2 F.3d 1058, 1068 (10th Cir. 1993).  The "in custody" requirement is satisfied only when a suspect's "freedom of action is curtailed to the degree associated with formal arrest."  *Berkemer v. McCarty*, 468 U.S. 420, 440 (1984)(quoting *California v. Beheler*, 463 U.S. 1121, 1125 (1983)).  See *United States v. Jones*, 523 F.3d at 1239.  Further, "'the initial determination of custody depends on the objective circumstances of the interrogation, not on the subjective views harbored by either the interrogating officers or the person being questioned.'" *United States v. Rogers*, 391 F.3d 1165, 1171 (10th Cir. 2004)(quoting *Stansbury v. California*, 511 U.S. 318, 323 (1994)).  In determining the custodial nature of an interrogation, the Court must "determine whether 'a reasonable person in the suspect's position would have understood the situation as the functional equivalent of formal arrest.'" *United States v. Chee*, 514 F.3d at 1112 (quoting *Berkemer v. McCarty*, 468 U.S. at 442)(alterations omitted).

The Tenth Circuit, in recognizing that an examination of the totality of the circumstances is fact intensive, has instructed district courts to consider a number of non-exhaustive factors in determining whether a custodial interrogation took place.  See United States v. Jones, 523 F.3d at 1240.  Those factors include: (i) whether the suspect is informed that he or she may end the interview at will or is not required to answer questions; (ii) whether the nature of the interview is likely to create a coercive environment from which a suspect would not feel free to leave, such as where there is prolonged accusatory questioning; and (iii) whether the police dominate the encounter with the suspect.  See id. (quoting United States v. Griffin, 7 F.3d 1512, 1518 (10th Cir. 1993)).  Police domination of the encounter is indicated by: (i) separating the suspect from others who could lend moral support; (ii) isolating the suspect in nonpublic questioning rooms; (iii) the threatening presence of multiple officers; (iv) displaying of weapons by an officer; (v) physical contact with the suspect; and (vi) use of language or vocal tones which suggest that compliance with an officer's request is compulsory.  See id.  The Tenth Circuit was deliberate in emphasizing, however, that courts must consider the circumstances surrounding the police-citizen encounter as a whole, rather than exclusively relying on some enumerated factors while ignoring others.  See id.

### DUE PROCESS REQUIREMENTS FOR VOLUNTARINESS OF A CONFESSION

For a confession to be admissible it must not only comply with Miranda v. Arizona's requirements, but, to satisfy due process, must also be voluntary.  See Dickerson v. United States, 530 U.S. 428, 434 (2000)("We have never abandoned this due process jurisprudence, and thus continue to exclude confessions that were obtained involuntarily.").  The due-process voluntariness test examines "whether a defendant's will was overborne by the circumstances surrounding the giving of a confession."  Dickerson v. United States, 530 U.S. at 434 (internal quotation marks omitted)(quoting Schneckloth v. Bustamonte, 412 U.S. 218, 226 (1973)).  "The due process test

takes into consideration the totality of all the surrounding circumstances -- both the characteristics of the accused and the details of the interrogation." Dickerson v. United States, 530 U.S. at 434 (internal quotation marks omitted).  The Court must weigh "the circumstances of pressure against the power of resistance of the person confessing."  Dickerson v. United States, 530 U.S. at 434 (internal quotation marks omitted)(quoting Stein v. New York, 346 U.S. 156, 185 (1953)).

### RELEVANT LAW REGARDING THE INEVITABLE-DISCOVERY DOCTRINE

When evidence is obtained in violation of a person's Fourth- or Fifth-Amendment rights, the government will generally be prohibited from using that evidence in a criminal prosecution of that person. See Sanchez-Llamas v. Oregon, 548 U.S. 331, 332-33 (2006)("[T]he exclusionary rule has been used primarily to deter certain Fourth and Fifth Amendment violations, including, e.g., unconstitutional searches and seizures, and confessions exacted in violation of the right against compelled self-incrimination or due process." (citations omitted)); United States v. Calandra, 414 U.S. 338, 347 (1974)("Under this rule, evidence obtained in violation of the Fourth Amendment cannot be used in a criminal proceeding against the victim of the illegal search and seizure.").  The exclusionary rule will apply if the defendant can show, by a preponderance of the evidence, a constitutional violation and a causal nexus between the violation and the evidence sought to be excluded.  See United States v. Torres-Castro, 470 F.3d 992, 999 (10th Cir. 2006).  Once the defendant makes this showing, if the prosecutor still desires to proffer the challenged evidence, the burden shifts to the government to prove that an exception to the exclusionary rule applies.  See United States v. Torres-Castro, 470 F.3d at 999.

The exclusionary rule has exceptions.  If illegally obtained evidence is somehow purged of the taint of the unconstitutional conduct, it can be admitted.  "The Government can establish that a particular item of evidence has been purged of the primary taint by demonstrating that the evidence

would have been inevitably discovered, was discovered through independent means, or was so attenuated from the illegality as to dissipate the taint of the unlawful conduct." United States v. Olvares-Rangel, 458 F.3d 1104, 1109 (10th Cir. 2006). See United States v. Torres-Castro, 470 F.3d at 999 ("[T]he government may avoid suppression by demonstrating that the evidence would have been inevitably discovered, that it was discovered by independent means, or that it was so attenuated from the illegality as to dissipate any taint from the Fourth Amendment violation.").

One exception to the exclusionary rule is the inevitable-discovery doctrine. The doctrine permits courts to admit unconstitutionally obtained evidence "if an independent, lawful police investigation inevitably would have discovered it." United States v. Owens, 782 F.2d 146, 152 (10th Cir. 1986). See United States v. Torres-Castro, 470 F.3d at 999. "Inevitable discovery analysis thus requires the court to examine each of the contingencies involved that would have had to have been resolved favorably to the government in order for the evidence to have been discovered legally and to assess the probability of the contingencies having occurred." United States v. Cunningham, 413 F.3d 1199, 1203 (10th Cir. 2005). The inevitable-discovery doctrine "applies whenever an independent investigation inevitably would have led to discovery of the evidence, whether or not the investigation was ongoing at the time of the illegal police conduct"; "it is possible for an investigation that begins after the violation to be independent of the illegal investigation." United States v. Larsen, 127 F.3d 984, 986-87 (10th Cir. 1997). See United States v. Cunningham, 413 F.3d at 1204 n.1 (stating that there is no conflict between the rules set forth in United States v. Larsen and United States v. Cunningham). "[A]s long as it can be shown by demonstrated historical facts that an independent and untainted discovery would inevitably have occurred, the evidence will be admissible." United States v. Griffin, 48 F.3d at 1151 (internal quotation marks omitted).

In United States v. Owens, the Tenth Circuit emphasized the "danger of admitting unlawfully

obtained evidence on the strength of some judge's speculation that it would have been discovered legally anyway."  782 F.2d at 152-53.  The Tenth Circuit considered whether contraband seized without a warrant could still be admitted under the inevitable-discovery doctrine.  Rejecting the government's position that the motel maids' routine cleaning of the defendant's room for the next occupant would have revealed the contraband and that, therefore, discovery of the evidence was inevitable, the Tenth Circuit found:

> Several factors suggest that motel employees performing routine cleaning may not have inevitably discovered the cocaine. First, if the [motel]'s staff had cleared [the defendant's] room, they would not necessarily have opened and searched all his luggage and closed containers. In fact, such an intrusion would have been a significant invasion of his privacy.  Second, even if the room had been cleared and the white powder inside the closed bag had been discovered by the motel staff, the lack of any police involvement in routine room cleanings suggests that police discovery of the evidence would not have been inevitable.  The evidence certainly does not demonstrate that the [motel]'s staff would necessarily have recognized the powder as cocaine or have called the police if they had so recognized it.  Finally, absent the unlawful search, [the defendant] might have posted bail on the charge of receiving stolen property and could have returned to his motel room before either the cleaning staff or the police discovered the contraband.  Alternatively, a friend could have returned to claim the closed bag.

United States v. Owens, 782 F.2d at 153.  "United States v. Owens suggests that courts should be realistic, if not skeptical, when assessing the probability that law-enforcement officers would inevitably have uncovered the challenged evidence through an independent investigation."  United States v. Martinez, 696 F.Supp.2d 1216, 1244 (D.N.M. 2010)(Browning, J.), aff'd, 643 F.3d 1292 (10th Cir. 2011).

## ANALYSIS

Rodriguez makes the following arguments to support his motion to suppress: (i) the APD officers lacked reasonable suspicion to conduct an investigatory stop to question him; (ii) Terry v. Ohio principles do not apply to investigation of a misdemeanor; (iii) the scope of the investigatory

stop exceeded the bounds the Fourth Amendment permits; (iv) the officers obtained his pre-arrest statements in violation of Miranda v. Arizona; (v) the officers obtained an involuntary confession from him in violation of the Due Process Clause; and (vi) no exceptions to the exclusionary rule should apply.  The Court concludes that most of these arguments do not have a sound basis in the law or facts, and none support the motion.

## I.    THE LAW ENFORCEMENT OFFICERS HAD REASONABLE SUSPICION OF CRIMINAL ACTIVITY TO INVESTIGATE RODRIGUEZ.

Rodriguez contends that the officers did not have reasonable suspicion to conduct an investigatory stop.  See Motion at 4-5.  He contends that the anonymous tip they received from the 911 call was not sufficient to give them reasonable suspicion.  See Motion at 5-9.  Rodriguez contends that the anonymous tip did not convey sufficient information for officers to conclude that a crime had occurred.  See Motion at 5-6.  Additionally, he contends that the anonymous call lacked sufficient indica of reliability.  See Motion at 6-8.  He asserts that officers observing a weapon does not by itself give rise to reasonable suspicion.  See Motion at 9.  He also argues that there are various exceptions under New Mexico law permitting a person to carry a concealed handgun without a permit, including if they are "on real property belonging to him as owner, lessee, tenant or licensee." Motion at 10 (emphasis omitted)(quoting N.M.S.A. 1978, § 30-7-2(A)(1)).  Rodriguez contends that he was working at the store with the owner's express permission, and that there is no evidence that the employer or owner objected to him carrying a firearm while he was in the store.  See Motion at 10.  Rodriguez asserts that whether the officers were mistaken about the existence or application of this law does not aid them in acquiring reasonable suspicion.  See Motion at 11.  He also notes that, given the misdemeanor nature of the potential offense, the officers could not justify an investigatory stop under the circumstances.  See Motion at 11-13.

The United States argues that the officers had reasonable suspicion to conduct an investigatory stop of Rodriguez.  See Response at 3-7.  The United States emphasizes that the officers had their own observations at the convenience store in addition to the 911 call to support their reasonable suspicion.  See Response at 4-5.  The United States contends that, when the officers faced the situation in the convenience store, they had three possible scenarios before them that required further investigation: (i) Rodriguez may have been carrying the handgun without the permit that New Mexico law requires; (ii) Rodriguez may have been lawfully carrying the handgun if he had express or implied consent from the store's owner; or (iii) he might have been a felon in possession of a firearm.  See Response at 4-5.  It asserts that, under New Mexico law, "[a] licensee carrying a concealed handgun on or about his person in public, shall, upon demand by a peace officer, display his license to carry a concealed handgun."  Response at 5 n.1 (citing N.M. Code R. § 10.8.2.16).  The United States argues that courts must evaluate the officer's conduct "in light of common sense and ordinary human experience," and defer to "the ability of a trained law enforcement officer to distinguish between innocent and suspicious actions."  Response at 6 (quoting United States v. Stephenson, 452 F.3d at 1776).  The United States contends that officers do not need to rule out the possibility of innocent conduct to form reasonable suspicion.  See Response at 6.  The United States asserts that the officers were entitled to procure Rodriguez' gun from him to protect their safety.  See Response at 6.  It argues that the principles in Terry v. Ohio regarding investigatory stops apply to misdemeanors.  See Response at 8-10.

### A.    THE OFFICERS HAD REASONABLE SUSPICION TO CONDUCT A INVESTIGATORY STOP.

An encounter that is not consensual may nevertheless be justified as an investigative detention.  An investigative detention occurs when an officer stops and briefly detains a person "in

order to determine his identity or to maintain the status quo momentarily while obtaining more information." Oliver v. Woods, 209 F.3d at 1186 (quoting Adams v. Williams, 407 U.S. 143, 146 (1972)). Inasmuch as such brief investigative detentions are not consensual, they constitute a seizure and must meet two distinct requirements to be "reasonable" under the Fourth Amendment. First, the officer "must have a particularized and objective basis for suspecting the particular person stopped of criminal activity." Oliver v. Woods, 209 F.3d at 1186. Second, the investigative detention that follows the stop must be "reasonably related in scope to the circumstances" which justified the stop in the first place, Terry v. Ohio, 392 U.S. at 20, because the Fourth Amendment imposes "limitations on both the length of the detention and the manner in which it is carried out," United States v. Holt, 264 F.3d at 1229.

"For reasonable suspicion to exist, an officer 'need not rule out the possibility of innocent conduct;' he or she simply must possess 'some minimal level of objective justification' for making the stop." United States v. Winder, 557 F.3d at 1134. This standard is met by information "falling 'considerably short' of a preponderance standard." United States v. Winder, 557 F.3d at 1134. A police/citizen encounter that goes beyond the limits of a stop under Terry v. Ohio is an arrest which must be supported by probable cause or consent to be valid. See United States v. Perdue, 8 F.3d at 1462 ("An encounter between police and an individual which goes beyond the limits of a Terry stop, however, may be constitutionally justified only by probable cause or consent.").

Neither "inarticulable hunches," nor "inchoate and unparticularized suspicion," will suffice to justify an investigatory detention. Terry v. Ohio, 392 U.S. at 22, 27. In determining the reasonableness of an investigation detention, however, "'common sense and ordinary human experience must govern over rigid criteria.'" United States v. Walraven, 892 F.2d 972, 975 (10th Cir. 1989)(quoting United States v. Sharpe, 470 U.S. 675, 685 (1985)). An investigative detention

may be unreasonable when it exceeds the permissible scope allowed under the Fourth Amendment.

See United States v. King, 990 F.2d at 1557.

The Tenth Circuit has discussed the propriety of investigative detentions in the context of New Mexico's concealed handgun statute. Specifically, it noted that, even when a citizen may be carrying a firearm in a manner that complies with an exception to New Mexico's concealed handgun statute, those facts are not dispositive in determining whether police may properly conduct an investigatory stop related to the handgun. See United States v. King, 990 F.2d at 1556. The Tenth Circuit stated the following:

> At the outset, it is important to note the limited scope of the government's appeal. The government does not contest the district court's finding that Officer LeMasters lacked a reasonable suspicion of criminal activity. Accordingly, we express no opinion on whether a police officer's observation of an apparently loaded pistol partially tucked under a motorist's leg would support a reasonable suspicion that the motorist was engaged in criminal activity other than to note that the state law permitting motorists to carry guns in their vehicles, N.M. Stat. Ann. § 30-7-2(A)(2) (Michie Supp. 1992), is not dispositive on the issue.

United States v. King, 990 F.2d at 1556. To support this assertion, the Tenth Circuit cited the following language from Reid v. Georgia, 448 U.S. 438 (1980): "[W]holly lawful conduct might justify the suspicion that criminal activity was afoot." United States v. King, 990 F.2d at 1556 (alteration in original)(quoting Reid v. Georgia, 448 U.S. at 442).

In United States v. Davis, 94 F.3d 1465 (10th Cir. 1996), the Tenth Circuit discussed whether police officers had reasonable suspicion to believe that a person was unlawfully carrying a concealed firearm. In that case, three officers were patrolling an area where in the past there had been reports regarding gunshots fired. See id. at 1467. One building in that area was known for selling liquor without a license, but other legal activities such as playing dominoes also occurred there. See id. On the night of the defendant's arrest, these three officers observed a brown vehicle containing four

-32-

occupants near this establishment.  See id.  When the officers arrived, the defendant exited the

vehicle, making eye contact with one of the officers and then breaking eye contact with the officer.

See id.  He then began walking towards this establishment.  See id.  The officer with whom the

defendant made eye contact knew that this man was an ex-convict who had been acquitted of gang-

related homicide.  See id.  None of the officer's prior contact with criminal activity in this area

involved this defendant.  See id.  The officers told the defendant to stop and to take his hands out

of his pockets, and the defendant continued walking in the same direction and manner without

reacting to the officers.  See id.  The officer with previous interactions with this defendant testified

that he was then concerned at that point about officer safety and believed the defendant might be

hiding a firearm.  See id.  The officers then grabbed the defendant's arms and told him to place his

hands on top of a vehicle.  See id.  The defendant had a firearm in his possession.  See id.  The Tenth

Circuit concluded that no reasonable suspicion was present to justify an investigatory stop.  See id.

at 1468-70.  The Tenth Circuit noted that the defendant breaking eye contact with the officers was

not alone sufficient to provide a particularized and objective basis for suspecting the stopped person

of criminal activity.  See id.  The Tenth Circuit also noted that the defendant had no obligation to

respond to the officers under these circumstances, and his continuing to walk away from them did

not give rise to reasonable suspicion.  See id. at 1468-69.  It also found that the officers had no

particularized basis for suspecting the defendant had a weapon, regardless of one of the officer's

intuition that the defendant had a weapon.  See id. at 1469.  The Tenth Circuit held that knowledge

of a suspect's criminal record alone does not give rise to reasonable suspicion.  See id.  Lastly, the

Tenth Circuit concluded that these facts in conjunction did not give rise to a reasonable suspicion.

See id. at 1469-70.  The Tenth Circuit stated: "There was no evidence that the officers spotted a

suspicious bulge in Davis' coat pockets, that Davis appeared to be hiding anything in his pockets,

that a tipster informed police that Davis was armed or carrying drugs, or that Davis made any threatening move towards the officers." Id. at 1470.

In comparison, the United States Court of Appeals for the Fourth Circuit found that reasonable suspicion existed to detain a defendant for carrying a concealed firearm in violation of state law based on the following facts: (i) the officer knew that the area was a high crime area in which the officer had made numerous arrests; (ii) while the officers were talking to the defendant, he had his "right hand awkwardly inserted halfway in his right-hand pocket, 'cupped' as if 'grasping an object'"; (iii) the defendant hesitated to remove his hand from his pocket when requested to do so; (iv) after the defendant removed his hand, the officer observed a bulge in the defendant's pocket; (v) the defendant lied about what was in his pocket, saying he had nothing in there other than his money and his identification; and (vi) after the defendant realized that the officers thought he was lying, he put his hand back in his pocket.  See United States v. Black, 525 F.3d 359, 361-62, 365 (4th Cir. 2008).

Relying on Pennsylvania court decisions that possession of a concealed firearm in public gives rise to reasonable suspicion for further detention even though Pennsylvania permitted lawful possession of concealed firearms in some circumstances, the United States Court of Appeals for the Third Circuit concluded that "observance of an individual's possession of a firearm in a public place in Philadelphia is sufficient to create reasonable suspicion to detain that individual for further investigation."  United States v. Cooper, 293 F.App'x 117, 119 (3d Cir. 2008)(unpublished).  The Third Circuit mentioned that, but did not appear to rely on, "licensure is an affirmative defense to a statutory violation for possession of a firearm" in Pennsylvania.  See United States v. Cooper, 293

F.App'x at 120.[6]  The United States Court of Appeals for the Second Circuit recognized that, when officers saw a defendant sticking into his waistband an object that appeared to be a gun, the officers had reasonable suspicion to conduct an investigatory stop.  See United States v. Lucas, 68 F.App'x 265, 266-67 (2d Cir. 2003)(unpublished).  The Second Circuit stated the following:

> The officer's personal observation of an object that appeared to be a gun created adequate "reasonable suspicion" to believe that appellant was unlawfully possessing a firearm, and justified conducting a limited weapons search to protect the safety of officers and others. That New York state permits certain licensed individuals to carry concealed weapons does not negate the officer's reasonable suspicion that unlawful activity was afoot, since the officers were entitled to draw on their experience that far more individuals who carry concealed handguns do not have licenses than do. Cf. United States v. Forero-Rincon, 626 F.2d 218, 222 (2d Cir. 1980)(holding that the fact that a suspect's conduct may be as consistent with innocent activity as with nefarious activity does not preclude that conduct from supporting reasonable suspicion).

United States v. Lucas, 68 F.App'x at 268.

Turning to the facts of this case, the government has conceded that the 911 telephone call from Nancy on its own did not provide the officers with reasonable suspicion to conclude that a crime had occurred.  The information the officers received from the APD dispatch indicated to them that two men had been showing guns to one another in the convenience store and provided a description of the individuals.  These two suspects' conduct in showing firearms to one another may have been entirely innocent, but that does not mean that police could not consider it in determining that reasonable suspicion exists.  See United States v. King, 990 F.2d at 1556 ("[W]holly lawful conduct might justify the suspicion that criminal activity was afoot." (alteration in original)(quoting Reid v. Georgia, 448 U.S. at 442)).  When the officers arrived at the convenience store, through their

---

[6]In a separate case, the Third Circuit relied on, in reaching its conclusion, that the law in the Virgin Islands gave the government the burden of proof in proving that a license does not exist.  See United States v. Ubiles, 224 F.3d 213, 217-18 (3d Cir. 2000).  In that case, the Third Circuit found that reasonable suspicion did not exist based on a suspect possessing a firearm alone.  See id.

own observations, they saw the gun concealed under Rodriguez' shirt and tucked into his waistband. While it is true, as Rodriguez has argued, that he may have been able to possess the handgun[7] under N.M.S.A. 1978, § 30-7-2(A)(1),[8] the Tenth Circuit and the Supreme Court have recognized that, even when conduct may have been legal under state law, such possibility does not automatically preclude reasonable suspicion to conduct an investigatory stop. See United States v. King, 990 F.2d at 1556 ("[W]holly lawful conduct might justify the suspicion that criminal activity was afoot." (alteration in original)(quoting Reid v. Georgia, 448 U.S. at 442)). More specifically, the Tenth Circuit has recognized this principle in the context of New Mexico laws on carrying concealed weapons. See United States v. King, 990 F.2d at 1556.

The officers could have concluded, based on their observations, that Rodriguez would require a license to lawfully carry a concealed firearm. See N.M.S.A. 1978, § 30-7-2(A)(5) (providing as an exception to the law that "carrying of a deadly weapon" is an offense when the person is "in possession of a valid concealed handgun license issued to him by the department of public safety pursuant to the provisions of the Concealed Handgun Carry Act"). Additionally, New Mexico law expressly permits officers to inquire of persons carrying a concealed handgun whether they have a license to do so. See N.M. Code R. § 10.8.2.16 ("A licensee carrying a concealed handgun on or about his person in public shall, upon demand by a peace officer, display his license

---

[7]The Court notes that Rodriguez contends that Awwad was one of the store's owners. The evidence at the hearing revealed that Awwad denied being one of the store's owners and informed the officers that other people were the store's owners. Officers must act on information they observe, and courts should not consider suspects' subjective intentions or knowledge as part of the Fourth Amendment analysis. See Reeves v. Churchich, 484 F.3d 1244, 1253 (10th Cir. 2007)

[8]This statute permits a person to carry a concealed handgun without a license when the person carries the handgun "in the person's residence or on real property belonging to him as owner, lessee, tenant or licensee." N.M.S.A. 1978, § 30-7-2(A)(1).

to carry a concealed handgun.").  The officers observed Rodriguez' concealed firearm before interacting with him or communicating with him.  No seizure could have occurred at this point, because the officers had not accosted Rodriguez in a way that restrained his freedom to walk away. See Terry v. Ohio, 392 U.S. at 16 ("It must be recognized that whenever a police officer accosts an individual and restrains his freedom to walk away, he has 'seized' that person.").  Thus, the officers did not need to justify their conduct under the Fourth Amendment at that point, because no seizure had occurred.  Other facts that support the existence of reasonable suspicion are that Munoz was aware that the convenience store was in a high crime area in town, and he had been to this particular gas station in the past numerous times to investigate reports of criminal conduct.  See United States v. Arvizu, 534 U.S. 266 (2002)(recognizing that officers are "entitled to make an assessment of the situation in light of his specialized training and familiarity with the customs of the area's inhabitants."); Ornelas v. United States, 517 U.S. 690, 699 (1996)("[A] police officer views the facts through the lens of his police experience and expertise.  The background facts provide a context for the historical facts, and when seen together yield inferences that deserve deference.").  Under these facts, the most important fact being the officers' firsthand observation of the firearm, the officers had reasonable suspicion that Rodriguez was carrying a firearm in violation of New Mexico law. It is not necessary for the Court to decide whether police would in all situations have reasonable suspicion to conclude a person is carrying a firearm in violation of concealed handgun laws when they observe a concealed handgun, such as if they were carrying a concealed handgun in their vehicle in compliance with New Mexico law but without a permit.[9]

---

[9]The Tenth Circuit has suggested that, once officers come into contact with a concealed firearm, probable cause exists to make an arrest for unlawfully carrying a concealed firearm in all circumstances in New Mexico.  See United States v. Henning, 906 F.2d at 1396 ("Once the patdown disclosed the presence of a loaded, concealed weapon, there was probable cause to arrest Henning

These facts make this case similar to the Fourth Circuit's United States v. Black decision. The Fourth Circuit in that case found that reasonable suspicion existed to detain a defendant for carrying a concealed firearm in violation of state law based on the following facts: (i) the officer knew that the area was a high crime area in which the officer had made numerous arrests; (ii) while the officers were talking to the defendant, he had his "right hand awkwardly inserted halfway in his right-hand pocket, 'cupped' as if 'grasping an object'"; (iii) the defendant hesitated to remove his hand from his pocket when requested to do so; (iv) after the defendant removed his hand, the officer observed a bulge in the defendant's pocket; (v) the defendant lied about what was in his pocket, saying he had nothing in there other than his money and his identification; and (vi) after the defendant realized that the officers thought he was lying, he put his hand back in his pocket. See United States v. Black, 525 F.3d at 361-62.  Notably, the officers in United States v. Black had reasonable suspicion even though they never observed the firearm before the investigatory detention began.  In this case, the officers observed Rodriguez' firearm tucked into his waistband.

That the officers observed the firearm also distinguishes this case from United States v. Davis, where the Tenth Circuit concluded that the officers did not have reasonable suspicion to believe that the defendant was illegally carrying a concealed handgun.  In that case, three officers were patrolling an area where in the past there had been reports regarding gunshots fired.  See 94 F.3d at 1467.  One building in that area was known for selling liquor without a license, but other legal activities such as playing dominoes occurred there.  See id.  On the night of the defendant's arrest, these three officers observed a brown vehicle containing four occupants near this establishment.  See id.  When the officers arrived, the defendant exited the vehicle, making eye

---

for carrying a concealed weapon in violation of N.M.Stat.Ann. § 30-7-2 (1978).").

contact with one of the officers and then breaking eye contact with the officer.  See id.  He then began walking towards this establishment.  See id.  The officer with whom the defendant made eye contact knew that this man was an ex-convict who had been acquitted of gang-related homicide.  See id.  None of the officer's prior contact with criminal activity in this area involved this defendant.  See id.  The officers told the defendant to stop and to take his hands out of his pockets, and the defendant continued walking in the same direction and manner without reacting to the officers.  See id.  The officer with previous interactions with this defendant testified that he was concerned at that point about officer safety and believed the defendant might be hiding a firearm.  See id.  The officers then grabbed the defendant's arms and told him to place his hands on top of a vehicle.  See id.  The defendant had a firearm in his possession.  See id.  Unlike in United States v. Davis, where the officers speculated that the defendant had a weapon even though they had no factual basis to support that conclusion, the officers in this case observed Rodriguez carrying a concealed firearm.  The officers here were not relying on ambiguous information, such as the defendant breaking eye contact with officers.  Importantly, the Tenth Circuit indicated that the result in the case might have been different if there was "evidence that the officers spotted a suspicious bulge in Davis' coat pockets."  Id. at 1470.  Officers did not merely observe a bulge in this case, but the actual firearm.

Rodriguez may object that the practical end result of the Court's decision is that, in New Mexico, a police officer's observation of a concealed handgun automatically creates reasonable suspicion.  The Court acknowledges that this may be a possibility.  One might object that, under the Second Amendment to the United States Constitution and state law, carrying a weapon is legal, and giving police authority to make an investigatory stop anytime they see lawful conduct is impermissible.  Given that guns raise particular problems for law enforcement, making the wrong decision might not be reversible for the officer.  The law tolerates some intrusion on lawful activity

that presents police with ambiguous acts that could also be unlawful.  In a free society, there must be a balance between legitimate police goals, public safety, and individual freedom.  The Court believes that to hold that officers may not investigate this conduct under the facts of this case would unduly restrict legitimate police conduct that was reasonable under the circumstances.  The Court reiterates, however, that it is not deciding whether seeing a concealed handgun by itself might trigger a reasonable suspicion that a crime is being committed under all factual scenarios.  The surrounding circumstances would likely affect that inquiry in ways the Court need not address today.

Consequently, the officers could permissibly conduct an investigatory stop and question Rodriguez based on their reasonable suspicion that he was carrying a concealed firearm, at least until the investigatory stop transformed into an arrest under the Fourth Amendment.  "[A] police officer may in appropriate circumstances," possession of reasonable suspicion, "and in an appropriate manner approach a person for purposes of investigating possibly criminal behavior even though there is no probable cause to make an arrest."  Terry v. Ohio, 392 U.S. at 23.

### B.   AN INVESTIGATORY STOP WAS PERMISSIBLE FOR THIS MISDEMEANOR OFFENSE.

Rodriguez contends that courts must on a case-by-case basis decide "whether an officer can detain a person for investigatory purposes upon a misdemeanor infraction."  Motion at 12.  He argues that there is no indication the officers believed Rodriguez was dangerous when they observed him.  See Motion at 12.  He notes that possessing a concealed dangerous weapon is a petty misdemeanor under New Mexico law punishable by only up to six months incarceration.  See Motion at 12-13.  Rodriguez asserts that the government's interests do not outweigh the intrusion on his personal security under the facts of this case.  See Motion at 13. The United States contends that the officers were not investigating a past crime, but a crime possibly being committed in their

presence that could possibly be either a felony or a misdemeanor.  See Response at 8-9.  The United

States also notes that the intrusion on Rodriguez' personal security was minor.  See Response at 10.

The United States asserts that the Supreme Court of New Mexico has permitted investigatory stops

for misdemeanor offenses.  See Response at 10 (citing State v. Ochoa, 143 N.M. 749, 754, 182 P.2d

120 (2008)).

        The Supreme Court expressly reserved the question in United States v. Hensley, 469 U.S.

221 (1985), whether investigatory stops were permissible to investigate all past crimes, such as

completed misdemeanors.  See 469 U.S. at 229 ("We need not decide today whether Terry stops to

investigate all past crimes, however serious, are permitted").  The Tenth Circuit has recognized that

investigatory stops are permissible under some circumstances to investigate completed

misdemeanors.  See United States v. Moran, 503 F.3d 1135, 1143 (10th Cir. 2007).  It emphasized

"the limited and fact-dependent nature of [its] holding" in that it did not intend to "suggest that all

investigatory stops based on completed misdemeanors are reasonable."  United States v. Moran, 503

F.3d at 1143.  United States v. Moran involved police investigating criminal trespasses that had

occurred in the past.  See 503 F.3d at 1138-39, 1141-43.

        In an unpublished opinion, the Tenth Circuit stated in a situation where officers were dealing

with crimes in progress: "Reasonable suspicion of a misdemeanor is sufficient under Terry."  United

States v. Luginbyhl, 321 F.App'x 780, 784 (10th Cir. 2009).  More specifically, the Tenth Circuit

stated:

>        On these facts, the officer had reason to suspect, at a minimum, that defendant was
>        intoxicated in public, the judge concluded.  Reasonable suspicion of a misdemeanor
>        is sufficient under Terry.  Although when the officer spotted defendant he was not
>        stumbling or otherwise exhibiting signs of drunkenness, he could have been under
>        the influence of drugs.

United States v. Luginbyhl, 321 F.App'x at 784 (citing Gallegos v. City of Colo. Springs, 114 F.3d

1024, 1029 (10th Cir. 1997)).  In Gallegos v. City of Colorado Springs, the Tenth Circuit likewise permitted investigatory stops based on reasonable suspicion for misdemeanor conduct.  See Gallegos v. City of Colo. Springs, 114 F.3d at 1029 (permitting an investigatory stop to question a drunken man walking around on the street).  See also United States v. Luginbyhl, 321 F.App'x at 784 (noting that Gallegos v. City of Colorado Springs involved misdemeanor offenses).   In explaining the distinction for Fourth-Amendment purposes between investigating completed crimes and ongoing criminal activity, the Supreme Court stated:

> The factors in the balance may be somewhat different when a stop to investigate past criminal activity is involved rather than a stop to investigate ongoing criminal conduct.  This is because the governmental interests and the nature of the intrusions involved in the two situations may differ.  As we noted in Terry, one general interest present in the context of ongoing or imminent criminal activity is "that of effective crime prevention and detection."  A stop to investigate an already completed crime does not necessarily promote the interest of crime prevention as directly as a stop to investigate suspected ongoing criminal activity.  Similarly, the exigent circumstances which require a police officer to step in before a crime is committed or completed are not necessarily as pressing long afterwards.  Public safety may be less threatened by a suspect in a past crime who now appears to be going about his lawful business than it is by a suspect who is currently in the process of violating the law.  Finally, officers making a stop to investigate past crimes may have a wider range of opportunity to  choose the time and circumstances of the stop.

United States v. Hensley, 469 U.S. at 228-29.

Here the nature of the potential crimes were ongoing.  The Tenth Circuit has indicated that investigatory stops based on reasonable suspicion are permissible for ongoing misdemeanor offenses.  See United States v. Luginbyhl, 321 F.App'x at 784; Gallegos v. City of Colo. Springs, 114 F.3d at 1029.  The Tenth Circuit has not indicated that the limitations for investigations of completed misdemeanor offenses apply to ongoing misdemeanor offenses.  Nor would such a distinction make sense in the circumstances of this case.  As it has turned out, Rodriguez was committing a felony.  There is no sound reason to require officers to make the felony/misdemeanor

distinction when they are observing a possible crime -- involving a gun -- in progress.  Such a requirement would defeat the policy underlying Terry v. Ohio, which allows officers to investigate sometimes ambiguous behavior as long as they have reasonable suspicion in order to prevent harm to society.  Rodriguez was out in public in possession of a concealed firearm, rather than at his home where he would not need a permit to carry a weapon under New Mexico law.  See N.M.S.A. 1978, § 30-7-2(A)(1).  That potential crime was ongoing when the officers walked into the convenience store.  Furthermore, when the officers determined that Rodriguez might be a convicted felon, his possession of a firearm as a felon was also a potential ongoing felony offense.  See N.M.S.A. 1978, § 30-7-16(A)-(B) (making it a "fourth degree felony" for "a felon to receive, transport or possess any firearm . . . in this state").  Consequently, based on the ongoing nature of the offenses, investigatory stops for these offenses were permissible.

### C.   THE OFFICERS OBTAINED RODRIGUEZ' FIREARM FROM HIM WITHOUT VIOLATING THE FOURTH AMENDMENT.

An officer may "stop and frisk" an individual under the Fourth Amendment if a reasonably prudent person "in the circumstances would be warranted in the belief that his safety or that of others was in danger."  Terry v. Ohio, 392 U.S. at 27.  "The officer need not be absolutely certain that the individual is armed; the issue is whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger."  Terry v. Ohio, 392 U.S. at 27.  A frisk "must . . . be confined in scope to an intrusion reasonably designed to discover guns, knives, clubs, or other hidden instruments for the assault of the police officer."  Terry v. Ohio, 392 U.S. at 29.  In evaluating the validity of the stop-and-frisk, the totality of the circumstances must be considered.  See Florida v. Bostick, 501 U.S. at 436.

When officers have observed a firearm, the Tenth Circuit has given police officers wide

latitude to obtain firearms from suspects during an otherwise permissible investigatory stop.  In

United States v. Henning, 906 F.2d 1392 (10th Cir. 1990), officers were interacting with a suspect,

and as the suspect exited the vehicle, a machine gun fell out of the vehicle.  See 906 F.2d at 1396.

In explaining why the officers could permissibly stop and frisk the suspect, the Tenth Circuit stated:

> While it seems to us too plain to require comment, the instant the machine gun fell to the ground as Henning exited the vehicle, police officers were justified in performing a patdown search for their own protection and acted reasonably in doing so.  The presence of one firearm, especially a fully automatic weapon, certainly provides a law enforcement officer with a reasonable belief that the person being briefly detained may be carrying other deadly weapons.

United States v. Henning, 906 F.2d 1392 (citations omitted).

As the Court has already concluded, the officers had reasonable suspicion to justify their

investigatory stop.  Here, the officers had actual knowledge that Rodriguez had a firearm in his

possession, specifically the handgun in his waistband.  While the gun was tucked into his waistband,

it was immediately within Rodriguez' reach.  Munoz testified that he removed the weapon because

he was concerned for officer safety.  Given that the officers actually observed the firearm and that

it was immediately within Rodriguez' reach, "a reasonably prudent man in the circumstances would

be warranted in the belief that his safety or that of others was in danger."  Terry v. Ohio, 392 U.S.

at 27.  As the Tenth Circuit has likewise explained: "The presence of one firearm . . . certainly

provides a law enforcement officer with a reasonable belief that the person being briefly detained

may be carrying other deadly weapons."  United States v. Henning, 906 F.2d 1392 (citations

omitted).  Thus, under these circumstances, the officers properly obtained Rodriguez' weapon from

him to protect their safety.  The Court notes that Rodriguez has not argued that the officers

improperly used the information on Rodriguez' firearm to run a check to see if the firearm was

stolen.  Consequently, the Court does not address that issue.

## II.   WHEN THE OFFICERS QUESTIONED RODRIGUEZ OUTSIDE THE CONVENIENCE STORE, AN ARREST HAD NOT OCCURRED UNDER THE FOURTH AMENDMENT.[10]

A seizure that exceeds the investigative detention's limited scope or duration may nevertheless be justified as an arrest.  An arrest is a seizure that is "characterized by highly intrusive or lengthy search or detention."  Oliver v. Woods, 209 F.3d at 1186 (quoting United States v. Cooper, 733 F.2d 1360, 1363 (10th Cir. 1984)).  The general rule is that "the use of firearms, handcuffs, and other forceful techniques" is sufficiently intrusive to signal that a person has been placed under arrest.  United States v. Melendez-Garcia, 28 F.3d 1046, 1052-53 (10th Cir. 1994).  See Florida v. Royer, 460 U.S. 491, 499 (1983).  Inasmuch as an arrest exceeds an investigative stop's limited scope or duration, it must be supported by probable cause.

"[W]hether a particular seizure is reasonable is dependent on the 'totality of the circumstances.'"  Ryder v. City of Topeka, 814 F.2d 1412, 1419 n.16 (10th Cir. 1987).  An arrest constituting a seizure occurs when there is the exercise of a certain degree of physical force or submission to the assertion of authority.  See California v. Hodari, 499 U.S. 621, 626 (1991).  The Tenth Circuit has identified several factors that are relevant in determining whether an arrest has occurred for Fourth-Amendment purposes. They include:

> 1) The threatening presence of several officers; 2) the brandishing of a weapon by an officer; 3) some physical touching by an officer; 4) the use of aggressive language or tone of voice indicating that compliance with an officer's request is compulsory; 5) prolonged retention of a person's personal effects; 6) a request to accompany the

---

[10]The Court notes that it is not clear from Rodriguez' Motion that he argues that the officers' investigatory stop exceeded the permissible scope of an investigatory stop and thus required probable cause to support an arrest.  It is clear that Rodriguez made arguments on these issues at the hearing.  Rodriguez may not have adequately presented these arguments to the Court to avoid their waiver by failing to raise them properly in his Motion.  Given the argument at the suppression hearing, the Court will assume that Rodriguez has adequately presented these arguments for its consideration and will address these arguments.

officer to the station; 7) interaction in a nonpublic place or a small, enclosed space; 8) and absence of other members of the public.

Jones v. Hunt, 410 F.3d 1221, 1226 (10th Cir. 2005)(internal quotation marks omitted).

Regarding the first of these eight factors, two officers were present outside the convenience store with Rodriguez. While there were only two officers as opposed to a larger number of officers, the presence of two officers makes this factor weigh moderately in favor of finding an arrest occurred. Second, there is no indication that the officers brandished a weapon at Rodriguez while they were questioning him outside the convenience store. While the officers were holding the weapon they obtained from Rodriguez while interviewing him, there is no evidence suggesting they brandished the weapon at him. Brandish means to "wave or flourish (something, esp. a weapon) as a threat or in anger or excitement." New Oxford American Dictionary 210 (Angus Stevenson & Christine A. Lindberg eds., 3d ed. 2010). There is no indication that officers engaged in this conduct. Third, the officers physically touched Rodriguez when they obtained his weapon from his waistband for their safety.[11] Officers may permissibly stop and frisk suspects for weapons, however, without transforming an investigatory detention into a an arrest. See United States v. Albert, 579 F.3d 1188, 1196 (10th Cir. 2009)("If the officer discovers what he believes to be a weapon, he may reach inside the suspect's clothing and remove it."). An officer may procure weapons from a suspect for their own safety as part of an investigatory detention if a reasonably prudent person "in the circumstances would be warranted in the belief that his safety or that of others was in danger." Terry v. Ohio, 392 U.S. at 27. Beyond obtaining Rodriguez' weapon, it does not appear that the

---

[11]There was not sufficient evidence at the evidentiary hearing for the Court to conclude that officers frisked Rodriguez an additional time when they asked him to place his hands on the vehicle. See Munoz Belt Tape at 2:18-19. There was no testimony regarding whether officers frisked Rodriguez an additional time after obtaining his handgun, so the Court will not find that there was an additional frisk, but only the physical contact to remove the weapon.

officers had physical contact with Rodriguez before placing handcuffs on him. Fourth, Munoz' tone became more aggressive during his questioning when he stated: "It's against the law to conceal a firearm. That's what's going on. Somebody came in your store and saw it. I just saw it when I walked in." Recording of Munoz Belt Tape at 4:00-5:00; Munoz Belt Tape at 3:7-11. While Munoz spoke in a firm tone before this point as the Court could determine from the recording of the belt tape, his tone was not aggressive at the beginning of the questioning outside the convenience store. At this point in time, he had already asked Rodriguez whether he had a permit to carry the firearm, and Rodriguez responded he did not. See Munoz Belt Tape at 2:12-14. The Court notes that many of the questions Munoz asked after this point were in a non-aggressive manner, see Recording of Munoz Belt Tape at 4:00-9:30, so this factor does not weigh heavily in favor of Rodriguez.

Fifth, the only personal effect which the officers obtained from Rodriguez was his firearm. Officers may permissibly retain a suspect's weapons for their own personal safety without turning an investigatory detention into an arrest. See Terry v. Ohio, 392 U.S. at 27. In illustrating what personal effects officers might retain for a prolonged period of time under this factor, one Tenth Circuit case gave the example of "prolonged retention of a person's personal effects such as identification and plane or bus tickets." United States v. Sanchez, 89 F.3d 715, 718 (10th Cir. 1996)(emphasis added). Furthermore, even if a firearm would qualify as a personal effect within the contemplation of these factors, the questioning outside the convenience store lasted approximately fifteen minutes, which would not likely qualify as prolonged retention, and Rodriguez' questioning lasted for only six and a half minutes. Sixth, at no point on the belt tape was there a request that Rodriguez accompany the officers to the station. Seventh, officers questioned Rodriguez in front of a convenience store out in public, not in "a nonpublic place or a small, enclosed space." Jones v. Hunt, 410 F.3d at 1226. Eighth, there were "other members of the public"

outside the convenience store, as Awwad was there with Rodriguez during most of the questioning and was there by the time the questioning became aggressive.  Jones v. Hunt, 410 F.3d at 1226. Additionally, the location in front of the convenience store would have been visible to any members of the public in the immediate vicinity.  As the encounter took place around approximately 6:00 p.m. in the afternoon, the location would not likely have been remote and isolated from other members of the public.

Only two of these eight factors weigh in favor of concluding that the investigatory stop had risen to the level of an arrest requiring probable cause.  Assuming an arrest had occurred once Munoz' tone became more aggressive, Rodriguez' response that he did not have a permit to carry his concealed handgun, which preceded any aggressive questioning, gave the officers probable cause to conclude Rodriguez had committed the crime of unlawfully carrying a concealed handgun.  See United States v. Henning, 906 F.2d at 1396 ("Once the patdown disclosed the presence of a loaded, concealed weapon, there was probable cause to arrest Henning for carrying a concealed weapon in violation of N.M.Stat.Ann. § 30-7-2 (1978).").  Probable cause to make an arrest requires only that there is "a fair probability that a crime was being committed."  United States v. Traxler, 477 F.3d 1243, 1247 (10th Cir. 2007).  "An officer has probable cause to arrest if, under the totality of the circumstances, he 'learned of facts and circumstances through reasonably trustworthy information that would lead a reasonable person to believe that an offense has been or is being committed by the person arrested.'"  United States v. Morris, 247 F.3d 1080, 1088 (10th Cir. 2001).  "The rules governing probable cause are not technical; they are the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians must act."  Illinois v. Gates, 462 U.S. 213, 231 (1983)(internal quotation marks omitted).  Particularly once the officers knew Rodriguez did not have a permit to carry the concealed firearm, they had probable cause to

conclude he was violating New Mexico's concealed handgun laws.  See United States v. Henning, 906 F.2d at 1396.  The officers asked whether the owner of the store was present, and Rodriguez and Awwad responded that they were not.  Thus, under the circumstances, they could not readily ascertain if Rodriguez had permission from the owner to lawfully carry a firearm in the premises. Additionally, once the officers discovered that the firearm was stolen, they had probable cause to arrest Rodriguez for possession of stolen property under New Mexico law.  While it is not necessary for the Court to decide this issue, the officers may have had probable cause to arrest Rodriguez for possessing a firearm as a felon when the officers viewed Rodriguez' tattoos, which Munoz concluded originated in prison, and heard that Rodriguez had just left prison.  See N.M.S.A. 1978, § 30-7-16(A)-(B) (making it a "fourth degree felony" for "a felon to receive, transport or possess any firearm . . . in this state").

III.   **THE OFFICERS WERE NOT REQUIRED TO GIVE RODRIGUEZ WARNINGS CONSISTENT WITH MIRANDA V. ARIZONA WHEN THEY QUESTIONED HIM OUTSIDE THE CONVENIENCE STORE.**

The Tenth Circuit has recognized that, "[a]lthough some detentions not rising to the level of a formal arrest may be reasonable within the meaning of the Fourth Amendment, those same detentions may nonetheless create the custodial situation in which Miranda was designed to operate."  United States v. Revels, 510 F.3d 1269, 1274 (10th Cir. 2007).  Thus, it has recognized that "whether an individual is subject to a lawful investigative detention within the meaning of the Fourth Amendment does not necessarily answer the separate question of whether a suspect is in custody for purposes of Miranda."  United States v. Revels, 510 F.3d at 1274.

In determining whether a violation under Miranda v. Arizona occurred, courts should assess "whether a reasonable person in [the defendant's] position would have understood her freedom of action to have been restricted to a degree consistent with formal arrest."  United States v. Revels,

-49-

510 F.3d at 1275.  The Tenth Circuit has made clear that an investigatory stop, which may be a seizure for Fourth Amendment purposes, does not necessarily implicate Miranda v. Arizona. See United States v. Wynne, 993 F.2d 760, 765 n.3 (10th Cir. 1993)("For instance, an ordinary traffic stop and questioning, although constituting a seizure for Fourth Amendment purposes, does not involve custody for purposes of Miranda." (citing Pennsylvania v. Bruder, 488 U.S. 9, 10-11 (1988)).  More specifically, the Tenth Circuit has stated: "In weighing these considerations we keep in mind that '[g]enerally, Miranda warnings are not implicated in the context of a valid Terry stop.'" United States v. Thynberg, 411 F.App'x 181, 184 (10th Cir. 2011)(unpublished)(quoting United States v. Eckhart, 569 F.3d 1263, 1275 (10th Cir. 2009)).  When officers take highly intrusive steps to protect their safety, such as placing the person in handcuffs, in a police vehicle, or drawing weapons at them, an otherwise permissible stop under Terry v. Ohio will normally require warnings under Miranda v. Arizona.  See United States v. Eckhart, 593 F.3d at 1275.  ("The officers here did not take highly intrusive measures against Cardenas.  Cardenas was never handcuffed or placed in a police cruiser and no weapons were drawn.").  Courts should also consider the officers' "demeanor," and whether they "use[d] or threaten[ed] the use of force at any time."  United States v. Eckhart, 593 F.3d at 1275.

"Miranda rights need only be given to a suspect at the moment that suspect is 'in custody' and the questioning meets the legal definition of 'interrogation.'"  United States v. Chee, 514 F.3d at 112.  Any questioning by law-enforcement officers "reasonably likely to elicit an incriminating response" constitutes an interrogation.  Rhode Island v. Innis, 446 U.S. at 301.  See United States v. Medrano, 356 F.App'x at 107; United States v. Parra, 2 F.3d at 1068.  The "in custody" requirement is satisfied only when a suspect's "freedom of action is curtailed to the degree associated with formal arrest."  Berkemer v. McCarty, 468 U.S. at 440.  See United States v. Jones,

523 F.3d at 1239.   Further, "'the initial determination of custody depends on the objective circumstances of the interrogation, not on the subjective views harbored by either the interrogating officers or the person being questioned.'"   United States v. Rogers, 391 F.3d 1165, 1171 (10th Cir. 2004)(quoting Stansbury v. California, 511 U.S. 318, 323 (1994)).[12]   In determining the custodial nature of an interrogation, the Court must "determine whether 'a reasonable person in the suspect's position would have understood the situation as the functional equivalent of formal arrest.'"   United States v. Chee, 514 F.3d at 1112 (quoting Berkemer v. McCarty, 468 U.S. at 442)(alterations omitted).

The Tenth Circuit, in recognizing that an examination of the totality of the circumstances is fact intensive, has instructed district courts to consider a number of non-exhaustive factors in determining whether a custodial interrogation took place.   See United States v. Jones, 523 F.3d at 1240.   Those factors include: (i) whether the suspect is informed that he or she may end the interview at will or is not required to answer questions; (ii) whether the nature of the interview is likely to create a coercive environment from which a suspect would not feel free to leave, such as where there is prolonged accusatory questioning; and (iii) whether the police dominate the encounter with the suspect.   See id.   Police domination of the encounter is indicated by: (i) separating the suspect from others who could lend moral support; (ii) isolating the suspect in nonpublic questioning rooms; (iii) the threatening presence of multiple officers; (iv) displaying of weapons by an officer;

---

[12]Consequently, the Court disregards any of Munoz' testimony indicating that he did not think Rodriguez was free to disobey his orders or refuse to answer his questions whenever he ordered Rodriguez to exit the store.   See Tr. at 52:16-53:9 (Middlebrooks, Munoz).   Additionally, the Fourth Amendment analysis requires a court to consider the facts as presented on the scene without considering the officers' subjective intentions.   See Saucier v. Katz, 533 U.S. 194, 205 (2001), overruled on other grounds by Pearson v. Callahan, 555 U.S. 223 (2009); United States v. Hauk, 412 F.3d 1179, 1187 (10th Cir. 2005).

(v) physical contact with the suspect; and (vi) use of language or vocal tones which suggest that compliance with an officer's request is compulsory.  See id.  The Tenth Circuit was deliberate in emphasizing, however, that courts must consider the circumstances surrounding the police-citizen encounter as a whole, rather than exclusively relying on some enumerated factors while ignoring others.  See id.

The first factor weighs in favor of finding that the warnings in Miranda v. Arizona were necessary.  There is no evidence suggesting that the officers informed Rodriguez that he was free to end the interview at will or that he was not required to answer questions.  Thus, that factor weighs in favor of Rodriguez.

The second factor weighs against finding that the warnings in Miranda v. Arizona were necessary.  Here, there was no prolonged accusatory questioning, because the officers' interrogation of Rodriguez outside the convenience store, as indicated by the recording of the belt tape, lasted a maximum of six and a half minutes.  See Recording of Belt Tape at 4:00-10:30.  The Tenth Circuit has held that a one-hour interview in the suspect's home was not sufficiently prolonged to require warnings under Miranda v. Arizona.  See United States v. Lamy, 521 F.3d 1257, 1263 (10th Cir. 2008).  While Munoz' tone became more aggressive shortly into the interview, many of the questions he asked following that point were not asked in an aggressive manner.  See Recording of Munoz Belt Tape at 4:00-9:00.  Additionally, the Tenth Circuit has cautioned that "[g]enerally, Miranda warnings are not implicated in the context of a valid Terry stop."  United States v. Thynberg, 411 F.App'x at 184 (quoting United States v. Eckhart, 569 F.3d at 1275).  Given the length of the questioning, and that many of the answers Rodriguez seeks to suppress the officers acquired within the first five and a half minutes of the interview, see Recording of Munoz Belt Tape at 4:00-9:30; Munoz Belt Tape at 2:1-11:3, the Court does not conclude that this questioning

constituted prolonged accusatory questioning.  Munoz stopped asking Rodriguez questions about his criminal history and from where he obtained the gun after five and a half minutes into the interrogation.  <u>See</u> Recording of Munoz Belt Tape at 9:30-10:40.  He in fact told Rodriguez to stop talking after Rodriguez began complaining about his back.  <u>See</u> Munoz Belt Tape at 11:17.  After that point, the officer questioned Awwad.  <u>See</u> Munoz Belt Tape at 12:13-14:3.  After questioning Awwad, the interview came to an end.  <u>See</u> Munoz Belt Tape at 12:13-14:3.  Furthermore, none of the exceptions which the Tenth Circuit has discussed to the general rule that stops under <u>Terry v. Ohio</u> do not require warnings under <u>Miranda Arizona</u> would apply.  When officers take highly intrusive steps to protect their safety, such as placing the person in handcuffs, in a police vehicle, or drawing weapons at them, an otherwise permissible stop under <u>Terry v. Ohio</u> will normally require warnings under <u>Miranda v. Arizona</u>.  <u>See</u> <u>United States v. Eckhart</u>, 593 F.3d at 1275.  There is no indication that during the period in which officers questioned Rodriguez outside the convenience store that the officers placed Rodriguez in handcuffs, in a police vehicle, or drew weapons at him.  Courts should also consider the officers' "demeanor," and whether they "use[d] or threaten[ed] the use of force at any time."  <u>United States v. Eckhart</u>, 593 F.3d at 1275.  While Munoz had a somewhat aggressive demeanor when he was questioning Rodriguez, the Court has already noted that the short length of the interview outside the convenience store does not weigh in favor of finding prolonged accusatory questioning.  Thus, this second factor weighs against Rodriguez.

The third factor also weighs against finding that the warnings under <u>Miranda v. Arizona</u> were required.  Police domination of the encounter is indicated by: (i) separating the suspect from others who could lend moral support; (ii) isolating the suspect in nonpublic questioning rooms; (iii) the threatening presence of multiple officers; (iv) displaying of weapons by an officer; (v) physical

contact with the suspect; and (vi) use of language or vocal tones which suggest that compliance with an officer's request is compulsory.  See United States v. Jones, 523 F.3d at 1240.  First, while Rodriguez went outside the convenience store with the officers, Awwad was outside with him during the duration of the interview.  See Munoz Belt Tape at 2:23-3:13.  Given that Awwad was with Rodriguez during almost the entire interview, the Court does not conclude that Rodriguez was separated from others who could provide moral support.  See United States v. Lamy, 521 F.3d at 1263 (recognizing that warnings under Miranda v. Arizona were not required during an interview where an interview was conducted "in a common area of the [defendant's] home, during which his mother came and went from the room").  Second, there is no evidence that Rodriguez was isolated in a nonpublic questioning room.  He was outside -- in front of a convenience store -- and in public view.  Third, two officers were present outside the convenience store with Rodriguez.  While there were only two officers as opposed to a larger number of officers, the presence of two officers makes this third factor weigh moderately in Rodriguez' favor.  Fourth, there is no indication that officers displayed weapons at Rodriguez, other than the firearm they obtained from Rodriguez to protect themselves, which Munoz handed to his fellow officer to inspect and determine whether it was stolen. Fifth, there is no indication that the officers came into physical contact with Rodriguez, other than securing his concealed firearm from him.  Officers may permissibly procure weapons from suspects for their own protection during an otherwise permissible investigatory stop.  See United States v. Albert, 579 F.3d at 1196 ("If the officer discovers what he believes to be a weapon, he may reach inside the suspect's clothing and remove it.").  Sixth, there is some indication that Munoz asked questions in an aggressive manner, although many of his questions were non-aggressive.  Two of these subfactors weigh in favor of a conclusion that police dominated the encounter with Rodriguez, but the other four subfactors weigh against such a finding.  Consequently, the third factor

weighs against Rodriguez.

Given that only the first factor weighs in favor of a conclusion that warnings under Miranda v. Arizona were required, and given the Tenth Circuit's warning that "[g]enerally, Miranda warnings are not implicated in the context of a valid Terry stop," United States v. Thynberg, 411 F.App'x at 184, the Court concludes that warnings under Miranda v. Arizona were not necessary under these circumstances. Even if warnings under Miranda v. Arizona were required,[13] the Court notes that Rodriguez could suppress only his statements to officers obtained in violation of Miranda v. Arizona, and not evidence that officers obtain as a result of those statements. In United States v. Patane, 542 U.S. 630 (2004)(3-2-4 decision), five justices concluded that nontestimonial evidence obtained as a result of statements obtained in violation of Miranda v. Arizona are not excludable. See 542 U.S. at 643 ("Introduction of the nontestimonial fruit of a voluntary statement, such as respondent's Glock, does not implicate the Self-Incrimination Clause."); id. at 680 (Kennedy, concurring)("Admission of nontestimonial physical fruits (the Glock in this case), even more so than the postwarning statements to the police in Elstad and Michigan v. Tucker, 417 U.S. 433 (1974), does not run the risk of admitting into trial an accused's coerced incriminating statements against himself.").

## IV.   RODRIGUEZ HAS NOT IDENTIFIED ANY CONFESSION HE MADE INVOLUNTARILY.

For a confession to be admissible, it must not only comply with Miranda v. Arizona's requirements but, to satisfy due process, also be voluntary. See Dickerson v. United States, 530 U.S. at 434. The due-process voluntariness test examines "whether a defendant's will was overborne by

---

[13]There was no evidence at the suppression hearing indicating exactly when the officers gave Rodriguez the warnings under Miranda v. Arizona.

the circumstances surrounding the giving of a confession." Dickerson v. United States, 530 U.S. at 434 (internal quotation marks omitted)(quoting Schneckloth v. Bustamonte, 412 U.S. at 226). "The due process test takes into consideration the totality of all the surrounding circumstances -- both the characteristics of the accused and the details of the interrogation." Dickerson v. United States, 530 U.S. at 434 (internal quotation marks omitted).   The Court must weigh "the circumstances of pressure against the power of resistance of the person confessing." Dickerson v. United States, 530 U.S. at 434 (internal quotations omitted)(quoting Stein v. New York, 346 U.S. at 185).

Rodriguez did not testify at the suppression hearing.  Thus, the Court has little evidence regarding his particular characteristics other than his statements to the officers.  There was little testimony from Munoz that related to Rodriguez' personal characteristics.  Absent this evidence, the Court has no sound basis to conclude that Rodriguez was more susceptible than the average person to interrogation or that he has less education that the average person.  The Court also notes that Rodriguez has not directed the Court to the statements he contends were made involuntarily.[14] Rodriguez did not clarify his argument at the hearing.  The Court assumes that Rodriguez contends that all the statements he made while outside the convenience store were involuntary for purposes of this analysis.

The primary considerations in determining whether statements are involuntary are: (i) the facts and circumstances surrounding the interrogation; (ii) the particular psychological characteristics of the defendant; (iii) how the defendant reacts to those external facts given his or

_____

[14]The Tenth Circuit has discouraged distinguishing between confessions and statements, so the Court assumes for the purposes of deciding this argument that there is no distinction.  See Tenth Circuit Pattern Jury Instructions Criminal § 1.25 cmt., at 40 (2011)(citing Opper v. United States, 348 U.S. 84, 91 (1954)).

her particular psychological characteristics.  See Culombe v. Connecticut, 367 U.S. 568, 603-05 (1961).  Particularly important facts to consider in this analysis are: (i) the use of any physical force on the defendant; (ii) the use of psychological force; (iii) the use of improper threats against the defendant; (iv) the use of improper inducements or promises -- such as those that are impossible, improper, or illusory; and (v) the length of detention.  See Lynumn v. Illinois, 372 U.S. 528, 534 (1963)(recognizing that threats to cut off financial aid to a mother's infant child resulted in a coerced confession); Culombe v. Connecticut, 367 U.S. at 605-06 (stating that physical and psychological force are relevant considerations in determining voluntariness of a confession); Ashcraft v. Tennessee, 322 U.S. 143, 154 (1944)(recognizing that a thirty-six hour interrogation resulted in an involuntary confession); United States v. Lopez, 437 F.3d 1059, 1064 (10th Cir. )("[A] promise of leniency is relevant to determining whether a confession was involuntary and, depending on the totality of the circumstances, may render a confession coerced.").

In its findings of fact, the Court has laid out the particular factual circumstances surrounding the interrogation.  There is no evidence to support a conclusion that Rodriguez has any psychological characteristics that distinguish him from an average citizen or that he was more afraid during the interrogation than the average citizen would have been.  He does not appear to have been more emotionally unstable than an average citizen would have been during the interview.  The Court notes that Rodriguez did not testify at the suppression hearing, so it has had to rely circumstantially on the recording of the interview outside the convenience store to determine Rodriguez' psychological state and his psychological characteristics.  In some ways, that he appears to not have been taking some of the officers' questions seriously indicates that he may be less susceptible psychologically than the average citizen or less afraid than the average citizen.

With respect to Rodriguez' reactions to these external facts, he does not appear to have acted

in a manner suggesting he gave any statements in an involuntary manner for Fourteenth Amendment

purposes.  His reaction to the officers' questioning does not indicate that he was more fearful, more

emotionally upset, or more susceptible to coercion than an average citizen.  He may have actually

been less susceptible to these influences than an average citizen given that he does not have

appeared to take the questioning that seriously.  Additionally, some of the particularly important

external facts that courts consider do not indicate that there was any particularly coercive conduct

by the officers.  They did not use any physical force against him, other than procuring his handgun.

They did not use any psychological force against him, other than asking some questions in an

aggressive manner.  They made no threats against Rodriguez -- such as threats to do him bodily

harm or threats to cause harm to his family -- other than that he might go to jail for some of his

conduct.  They made no promises to Rodriguez and did not try to induce him to act in any particular

manner.  Additionally, the interrogation lasted for roughly six and a half minutes, which does not

indicate that it was particularly coercive.  See Ashcraft v. Tennessee, 322 U.S. at 154 (recognizing

that a thirty-six hour interrogation resulted in an involuntary confession).  Consequently, the Court

concludes, based on the evidence before it, that the statements he gave outside the convenience store

were voluntary.

## V.    IT IS NOT NECESSARY TO ADDRESS WHETHER ANY EXCEPTION TO THE EXCLUSIONARY RULE APPLIES.

The Court has concluded that the officers did not commit any constitutional violations.

Thus, it is not necessary to address the issue of whether any exceptions to the exclusionary rule

apply, as the Court has not excluded any evidence.  More importantly, the Court has an obligation

to avoid deciding constitutional issues not necessary to the disposition of a case.  See Burton v.

United States, 196 U.S. 283, 295 (1905)("It is not the habit of the Court to decide questions of a

constitutional nature unless absolutely necessary to a decision of the case.").

**IT IS ORDERED** that the Defendant's Motion and Memorandum to Suppress Evidence, filed October 3, 2011 (Doc. 24), is denied.

_____
UNITED STATES DISTRICT JUDGE

*Counsel:*

Kenneth J. Gonzales
  United States Attorney
Charles Barth
  Assistant United States Attorney
United States Attorney's Office
Albuquerque, New Mexico

    *Attorneys for the Plaintiff*

Kimberly A. Middlebrooks
Albuquerque, New Mexico

    *Attorney for the Defendant*